# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 16-748V
Filed: August 18, 2022

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * | | |
| CONSTANCE KOHL, | * | PUBLISHED |
| | * | |
| Petitioner, | * | |
| | * | Severity Requirement; Tetanus- |
| v. | * | diphtheria-acellular pertussis |
| | * | ("Tdap") Vaccine; Shoulder Injury |
| SECRETARY OF HEALTH | * | Related to Vaccine Administration |
| AND HUMAN SERVICES, | * | ("SIRVA"); Reconsideration |
| | * | |
| Respondent. | * | |
| | * | |
| * * * * * * * * * * * * * * * * | | |

*Mark Sadaka, Esq*., Mark T. Sadaka, LLC, Englewood, NJ, for petitioner.
*Debra Begley, Esq*., U.S. Department of Justice, Washington DC, for respondent.

## FACT RULING AND DISMISSAL DECISION[1]

**Roth**, Special Master:

On June 24, 2016, Constance Kohl ("Ms. Kohl" or "petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 et seq.[2] ("Vaccine Act" or "the Program"). Petitioner alleges that a tetanus-diphtheria-acellular pertussis ("Tdap") vaccination she received on June 28, 2013 caused her to develop a "frozen shoulder, stiffness, numbness, tingling, swelling, redness, and reduced range of motion." Petition, ECF No. 1.

The parties disagree whether petitioner has shown that she suffered the residual effects or complications of her alleged injury for more than six months, otherwise known as the severity requirement. § 300aa-11(c)(1)(D)(i-ii). After a fact hearing, I issued a ruling finding that

---

[1] This Decision has been designated "to be published," which means I am directing it to be posted on the Court of Federal Claims' website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)). This Decision will be available to anyone with access to the internet. However, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, this Ruling will be available to the public. *Id.*
[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

petitioner's alleged injury persisted in excess of six months. Respondent filed a Motion for Reconsideration ("Mot. Recons."). ECF No. 67. I granted respondent's Motion and withdrew my ruling. Order, ECF No. 70.

The following is a new fact ruling on the severity requirement. For reasons detailed below and with consideration of all medical records, testimony, and other documentary evidence accorded their appropriate weight, I find that there is insufficient evidence to conclude that petitioner's vaccine reaction and the effects thereof lasted for more than six months. Thus, the petition is DISMISSED.

## I.      Procedural History

The petition was filed on June 24, 2016. ECF No. 1. This matter was originally assigned to the Special Processing Unit ("SPU"). ECF No. 4.

Petitioner filed medical records on June 28, 2016 and a Statement of Completion on July 1, 2016. Petitioner's Exhibits ("Pet. Ex.") 1-6, ECF No. 5; ECF No. 7.

A status conference was held on August 16, 2016. Scheduling Order at 1-2, ECF No. 9. Respondent requested, and petitioner was ordered to produce, all chiropractic treatment records, any medical records corroborating petitioner's diagnosis of frozen shoulder, any evidence showing that petitioner suffered residual injuries in excess of six months, and an affidavit explaining the two-year gap in treatment between August 15, 2013 and April 19, 2016. *Id.*

Following an unopposed Motion for Extension of Time, petitioner filed medical records from Rosemeyer Jones Chiropractic and witness statements from Todd Fischer[3] and Dennis Paulus on December 16, 2016. *See* Motion, ECF No. 10; Non-PDF Order, issued Oct. 17, 2016; Pet. Ex. 7-9, ECF No. 11. Petitioner filed an additional statement from Todd Fischer on December 23, 2016, Pet. Ex. 10, ECF No. 13.

Respondent filed his Rule 4(c) Report on March 1, 2017, stating that "this case was not appropriate for compensation under the terms of the Act because petitioner has not established six months of sequela as required by 42 U.S.C. § 300aa-11(c)(1)(D)(i-ii)." Rule 4 at 1, ECF No. 16.

Petitioner was ordered to file a detailed affidavit addressing the gap in treatment between August 15, 2013 and April 19, 2016. Scheduling Order at 1, ECF No. 17. Following a Motion for Extension of Time, petitioner filed her affidavit on April 17, 2017. *See* Motion, ECF No. 19; Order, ECF No. 20; Pet. Ex. 11, ECF No. 21.

During a status conference on May 2, 2017, respondent requested that petitioner file additional documentation from her employer supporting her claim that she experienced residual effects of her alleged injury for longer than six months. Scheduling Order at 1-2, ECF No. 22. Petitioner's counsel stated that it was unlikely that petitioner's employer, a relatively small dairy

---

[3] The evidence filed in this matter uses "Fischer" and "Fisher" interchangeably; they both refer to Todd Fischer, his wife Julie Fischer, and their business, Fischer Dairy Farm.

farm in rural Wisconsin, would have such sophisticated record keeping. *Id.* at 2. However, petitioner's counsel agreed to try and secure additional evidence by June 1, 2017. *Id.*

Petitioner subsequently filed billing and employee records, a notice from the Workers Compensation Board showing that she had not made any claims, and a letter indicating the absence of any Medicaid lien. Pet. Ex. 12, ECF No. 23; Pet. Ex. 13-14, ECF No. 26; Pet. Ex. 15, ECF No. 28.

Respondent filed a status report on August 7, 2017, advising that he intended to continue defending this case and requested a status conference to discuss how to proceed. Resp. Status Rpt. ECF No. 29.

On August 8, 2017, this matter was reassigned to me. ECF No. 32. A status conference was held on August 29, 2017 to discuss the issues in this case, including the two-year-and-eight-month gap between petitioner's last treatment for her alleged left shoulder injury, August 15, 2013, and when she presented to Crossing Rivers Health and shoulder pain was noted, April 19, 2016. Scheduling Order at 1, ECF No. 33; Pet. Ex. 5 at 66-68. More specifically, petitioner stated in her affidavit that she did not visit a physician for her alleged injury because she did not have health insurance. Pet. Ex. 11 at 1. However, she consistently received chiropractic treatment from 2013 through 2016 for her neck, thoracic, and lower back pain. *See generally* Pet. Ex. 7. The chiropractic records did not reflect any complaints of left shoulder pain during the period in question. *See generally id.* Petitioner filed affidavits from her employer, Mr. Fischer, and co-worker, Mr. Paulus, about how her duties were adjusted as a result of her left shoulder injury, but the affidavits did not address how long the duties were adjusted. *See* Pet. Ex. 8-10. Additional evidence was filed, including tax returns that showed no lost income. *See* Pet Ex. 13. Petitioner's counsel stated that the record was complete and he was granted thirty days to consult with his client. Scheduling Order at 2.

Petitioner filed a status report on September 28, 2017, requesting thirty days to brief her case and asking that a ruling be issued as to whether petitioner satisfied the six-month requirement. Pet. Status Rpt. at 1, 5, ECF No. 34.

A status conference was held on October 4, 2017 to discuss petitioner's status report. Scheduling Order at 1, ECF No. 35. During the conference, respondent requested additional information from Mr. Fischer on how petitioner's work duties were adjusted to accommodate her injuries. *Id.* Petitioner was ordered to file an affidavit from Mr. Fischer by November 3, 2017. *Id.*

Petitioner filed an additional affidavit from her employer, Mr. Fischer on October 31, 2017. Pet. Ex. 16, ECF No. 36. On December 20, 2017, respondent filed a status report advising that he intended to continue defending this case. Resp. Status Rpt. at 1, ECF No. 38.

During a status conference on February 7, 2018, respondent's counsel stated that Mr. Fischer's affidavit was inconsistent with the records filed. Scheduling Order at 1, ECF No. 39. Petitioner's records showed that after her alleged injury, she exceeded the number of hours that she previously worked; however, after injuring her right shoulder in a fall in 2016, petitioner's work hours were reduced. *Id.* Respondent's counsel questioned why petitioner could continue

3

working normal hours after her alleged vaccine injury, but not after her shoulder injury from a fall in 2016. *Id.* Petitioner's counsel responded that, although petitioner did not need surgery for her 2016 shoulder injury, it was more serious than her alleged vaccine injury. *Id.* Petitioner was ordered to file her Facebook data, and respondent was ordered to file questions for petitioner to answer. *Id.*

Petitioner filed her Facebook data on March 20, 2018. Pet. Ex. 17, ECF No. 41. Respondent filed his status report on April 9, 2018, containing a list of questions to be answered and additional documents to be produced by petitioner. Resp. Status Rpt. at 1-2, ECF No. 42. Petitioner was ordered to file a response by June 8, 2018. Scheduling Order at 1, ECF No. 43.

On June 4, 2018, Petitioner filed a letter from Julie Fischer and her timesheets and those of her co-worker Dennis Paulus. Pet. Ex. 18-20, ECF No. 45. Petitioner filed a status report on June 7, 2018, indicating that she had fulfilled the requests made by respondent to the best of her ability and that no further records existed. Pet. Status Rpt. at 1, ECF No. 46.

Petitioner filed an additional status report on July 3, 2018, advising that she tried to secure records or a statement from Dr. Jones, her chiropractor, but was unable to do so. Pet. Status Rpt. at 1, ECF No. 47. She requested a fact hearing at this time. *Id.*

The parties were ordered to file a joint status report suggesting dates for a fact hearing to be held in February of 2019. Scheduling Order at 1, ECF No. 48. Petitioner filed a joint status report on August 23, 2018. Joint Status Rpt., ECF No. 47. On August 24, 2018, a pre-hearing order was issued, scheduling this matter for a fact hearing on Wednesday, February 6, 2019. Pre-Hearing Order, ECF No. 50.

After filing a status report on July 3, 2018 that she was unable to secure a statement from Dr. Jones, on the eve of the hearing, petitioner filed a letter from Dr. Jones dated September of 2017 in which he wrote that he had treated her during the timeframe at issue but could not admit nor deny her shoulder injury since he treated her for spinal issues. Pet. Ex. 21, ECF No. 54. Petitioner contemporaneously filed a status report advising that Dr. Jones' letter was inadvertently misfiled by his office and therefore had not been filed in this case. Pet. Status Rpt. at 1, ECF No. 55. He requested that the letter be permitted for use during the hearing. *Id.*

A fact hearing was held on Wednesday, February 6, 2019. Transcript ("Tr.") 1, ECF No. 61. Thereafter, petitioner filed updated primary care records on March 29, 2019. Pet. Ex. 23, ECF No. 58. On July 12, 2019, the parties jointly requested a determination on whether petitioner satisfied the severity requirement, and the record was closed.

On August 21, 2019, a Fact Ruling was issued, finding that petitioner suffered limitations of a left arm/shoulder injury for approximately ten months, satisfying the severity requirement. ECF No. 66.

On September 11, 2019, respondent filed a Motion for Reconsideration requesting that the Fact Ruling on the severity requirement be withdrawn. Mot. Recons., ECF No. 67. Citing RCFC 59(a)(1), respondent requested a new decision arguing that I "overlooked several pieces of key

evidence and made several substantive mistakes that could alter [my] determination." *Id.* at 1. Specifically, respondent argued that Petitioner's Exhibit 23, which contains primary care visits for the period in question, was not adequately addressed in my ruling. *See id.* at 6. Also, the medical records and timesheets filed seemed to contradict petitioner's testimony upon which I attributed significant weight in finding that petitioner satisfied the severity requirement. *See id.* at 7-9. Respondent further cited my misidentification of witness statements as sworn affidavits. *Id.* at 10.

Petitioner filed a Response to respondent's Motion for Reconsideration, urging the Court to deny respondent's Motion. Response to Motion for Recons. at 6, ECF No. 69. Petitioner cited respondent's failure to provide any reason for the Court to undertake reconsideration and argued that reopening the severity issue would improperly raise petitioner's burden. *Id.* More specifically, petitioner submitted that "none of the 'twenty (20)' medical visits," documented in Petitioner's Exhibit 23 "are relevant to this Court's ultimate decision." *Id.* at 4. Further, petitioner argued that the Ruling was supported by the record as "medical records submitted after the hearing do not change the record" and because "the time sheets do not directly contradict petitioner's testimony." *Id.* at 4-5. Addressing the misidentification of witness statements as sworn affidavits, petitioner argued that the witness statements offered were certified and appropriately considered in the Fact Ruling. *Id.* at 6.

On November 5, 2019, I granted respondent's Motion for Reconsideration. Order, ECF No. 70. In considering the papers filed by both parties and my initial Ruling, I agreed that some evidence in the record was not afforded the weight it should have been given. Further, the inconsistency between petitioner's testimony and what is reflected in her timesheets was not sufficiently addressed. These issues warranted a renewed analysis of the record in its entirety. *See* Scheduling Order, ECF No. 71.

Following a status conference on November 15, 2019, an Order was issued for petitioner to file additional evidence supporting the severity requirement. Scheduling Order, ECF No. 71. Petitioner was to specifically address all her medical visits documented in Exhibit 23 when she testified to not receiving care for her alleged vaccine-related shoulder injury because she could not afford the costs for further treatments. *Id.* at 2.

Petitioner filed additional medical records in February of 2020 from the UW Health Sports Medicine Clinic and her primary care practice, Crossing Rivers Health. Pet. Ex. 24, ECF No. 73; Pet. Ex. 25, ECF No. 75. Petitioner filed a supplemental affidavit on April 13, 2020 to revise and clarify the testimony she provided at the hearing. Pet. Ex. 26, ECF No. 79.

Respondent filed a status report on May 13, 2020, advising that the additional evidence submitted did not alter his position and requesting a status conference to discuss further proceedings. ECF No. 80.

Another status conference was held on June 18, 2020. The decision of *Kirby v. Sec'y Health & Human Servs.*, upon which respondent relied, was discussed. The then-recent Claims Court opinion held that petitioner's lay testimony, without the support of contemporaneous corroborating

medical records, was insufficient to satisfy the six-months severity requirement[4]. 148 Fed. Cl. 530 (2020), *reversed*, 997 F.3d 1378 (Fed. Cir. 2021). Scheduling Order, ECF No. 81. Petitioner was directed to secure any additional evidence she could provide supporting the severity requirement. *Id.* at 2.

Following the filing of additional medical records and a supplemental affidavit from petitioner, the parties were ordered to file briefs addressing the severity requirement by January 19, 2021. Pet. Ex. 27, ECF No. 82; Pet. Ex. 28, ECF No. 83; Non-PDF Order, issued Oct. 19, 2020.

On January 19, 2021, petitioner filed her brief. Brief, ECF No. 90. Primarily, petitioner states that the medical records alone provide sufficient evidence, specifically asserting:

> In sum, we have a prescription for pain medication to treat Connie's shoulder pain on July 6, 2013. We have a refill of that prescription on April 3, 2014, 9-months later. Then the next medical record we have in this case notes a left shoulder limited range of motion December 3, 2014. Connie has met the severity requirement based on the medical record alone.

*Id.* at 10. Additionally, petitioner argues that the witness statements from petitioner's boss, Todd Fischer, are credible and should be credited as affidavits because the witness used the language, "I, Todd Fischer, do swear and affirm the following," though there is no specific perjury language. *Id.* at 12.

Respondent filed a Motion to Dismiss and a Cross-Motion for Findings of Fact addressing the severity requirement. ("Resp. Cross-Mot.") ECF No. 91. Respondent argues that petitioner has failed to provide sufficient evidence to establish that her alleged injury persisted for at least six months. *Id.* at 9. Specifically, respondent submits that there is not preponderant corroborating evidence, only "three affidavits…oral testimony…and three unsworn statements from two other witnesses." *Id at 9-10*. Respondent analogizes the instant matter to *Kirby v. Sec'y Health & Human Servs.,*[5] 148 Fed. Cl. 530 (2020), *reversed*, 997 F.3d 1378 (Fed. Cir. 2021). *See id.* at 11. Respondent also urges the Court to disregard the unsworn witness statements as they appear to lack foundation and are inconsistent with petitioner's statements. *See id.* at 16-17. Respondent further notes that petitioner's own testimony and recollection are inconsistent with the documented record. *See id.* at 18-19. The deadline for petitioner to respond to respondent's Motion to Dismiss was suspended until further notice so that the severity requirement could first be determined. Scheduling Order, ECF No. 92.

---

[4] Discussed in further detail below, *Kirby* has since been reversed by the Federal Court of Appeals specifically on the issue of the severity requirement and the evidence thereof. The Federal Circuit held that the Special Master's finding that Ms. Kirby's injury lasted more than six months was not arbitrary or capricious because a "reasonable fact finder could conclude that Ms. Kirby's testimony is not inconsistent with her medical records." *Kirby v. Sec'y Health & Human Servs.*, 997 F.3d 1378, 1384 (Fed. Cir. 2021). The Special Master relied upon "Ms. Kirby's lay testimony, corroborating documentation, and expert testimony… Ms. Kirby testified that she continued her home exercises until her symptoms went away, which was "well over a year"… Evidence of record corroborates Ms. Kirby's testimony." *Id.* at 1381.
[5] Now reversed as mentioned above. *Ibid.*

The record is now ripe[6] for a new fact ruling on the issue of whether petitioner's record establishes the severity requirement by a preponderance of evidence.

## III.    Legal Framework

### A.    Overall Fact-Finding Framework

The process for making determinations in Vaccine Program cases regarding factual issues begins with analyzing the medical records, which are required to be filed with the petition. § 11(c)(2). Medical records created contemporaneously with the events they describe are generally considered to be more trustworthy. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *but see Kirby v. Sec'y of Health & Human Servs.*, 993 F.3d 1378, 1382-83 (Fed. Cir. 2021) (clarifying that *Cucuras* does not stand for proposition that medical records are presumptively accurate and complete). While not presumed to be complete and accurate, medical records made while seeking treatment are generally afforded more weight than statements made by petitioner after-the-fact. *See Gerami v. Sec'y of Health & Human Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013) (finding that contemporaneously documented medical evidence was more persuasive than the letter prepared for litigation purposes), *mot. for rev. denied*, 127 Fed. Cl. 299 (2014). Indeed, "where later testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation more weight." *Campbell ex rel. Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006); *see United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948).

Despite the weight afforded medical records, special masters are not bound rigidly by those records in determining facts such as the onset of a petitioner's symptoms. *Vallenzuela v. Sec'y of Health & Human Servs.*, No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); *see also Eng v. Sec'y of Health & Human Servs.*, No. 90-175V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb 18, 1994) (explaining that § 13(b)(2) "must be construed so as to give effect to § 13(b)(1) which directs the special master or court to consider the medical record...but does not require the special master or court to be bound by them"); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational). There are situations in which compelling oral testimony may be more persuasive than written records. *See Campbell ex rel. Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006). When witness testimony contradicts medical records, such testimony must be consistent, clear, cogent, and compelling to be persuasive. *See Sanchez v. Sec'y of Health & Human Servs*., No. 11-685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (vacated on other grounds, *Sanchez by & through Sanchez v. Sec'y of Health & Human Servs.*, No. 2019-1753, 2020 WL 1685554 (Fed. Cir. Apr. 7, 2020), review denied,

---

[6] Respondent cited the Court of Federal Claims' reversal in *Kirby* in both his Motion for Reconsideration and in his Cross-Motion for Findings of Fact addressing the severity requirement. However, *Kirby* was appealed in July of 2020, after respondent's Motion for Reconsideration had been granted. Given the significant relevance, this matter was held until the Circuit's decision was issued in August of 2021, which reversed the Court of Federal Claims' reversal and reinstated the Special Master's Decision.

*Sanchez by & through Sanchez v. Sec'y of Health & Hum. Servs.*, 152 Fed. Cl. 782 (2021)) (quoting *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *85 (Fed. Cl. Spec. Mstr. June 30, 1998)); *see, e.g.*, *Stevenson ex rel. Stevenson v. Sec'y of Health & Human Servs.*, No. 90-2127V, 1994 WL 808592, at *7 (Fed. Cl. Spec. Mstr. June 27, 1994) (crediting the testimony of a fact witness whose "memory was sound" and "recollections were consistent with the other factual evidence"). Special masters may also consider other types of evidence, such as unsworn statements, on the grounds that the Vaccine Program was designed to have "flexible and informal standards of admissibility of evidence." 42 U.S.C. § 300aa-12(d)(2)(B); *see also Munn v. Sec'y of Health & Human Servs.*, 970 F.2d 863, 873 (Fed. Cir. 1992).

On the whole, a special master's fact findings are to be upheld when the special master's evaluation is evidence-based and not wholly implausible. *See Colon v. Sec'y of Health & Human Servs.*, 156 Fed. Cl. 534 (2021).

## B.   Severity Requirement

The only question here is whether petitioner satisfied the severity requirement. The Vaccine Act requires petitioner to show by preponderant evidence that she "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine." 42 U.S.C. § 300aa-11(c)(1)(D)(i); *see Song v. Sec'y of Dep't of Health & Human Servs.,* 31 Fed. Cl. 61, 65-66 (1994), aff'd, 41 F.3d 1520 (Fed. Cir. 2014) (noting that a petitioner must demonstrate the six-month severity requirement by a preponderance of the evidence). A petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted). Finding that petitioner has met the severity requirement cannot be based on petitioner's word alone, though a special master need not base their finding on medical records alone. *See* § 13(a)(1); *see Colon v. Sec'y of Health & Human Servs.*, 156 Fed. Cl. 534, 541 (2021).

In *Kirby v. Sec'y Health & Human Servs.*, the special master's finding that Ms. Kirby's injury lasted for more than six months was upheld by the Circuit. 997 F.3d 1378 (Fed. Cir. 2021) (reversing *Kirby v. Sec'y Health & Human Servs.*, 148 Fed. Cl. 530 (2020), after the Claims Court found the special master erred in his severity finding). Ms. Kirby's medical records only documented two months of persisting symptoms after vaccination. Her records were silent thereafter for two years regarding shoulder pain. However, the special master found the following sufficient to overcome the silence in the contemporaneous medical records: 1) petitioner's testimony that she continued home exercises with her home exercise instruction sheets, 2) petitioner's later report to her nurse practitioner about ongoing shoulder pain that began after a vaccination two years ago, and 3) expert testimony of intermittent pain consistent with petitioner's specific shoulder injury. Based on that evidence, the special master found that petitioner satisfied the severity requirement. *Kirby,* 997 F.3d 1378, 1382. In upholding the special master's decision, the Circuit noted that the Claims Court incorrectly found the silence in the medical record as undermining petitioner's testimony. *See id.* Specifically discussing the presumption that medical records are accurate and complete, originating from an interpretation of *Cucuras*, the Circuit clarified:

*Cucuras* stands for the unremarkable proposition that it was not erroneous to give greater weight to contemporaneous medical records than to later, contradictory testimony. We did not hold that medical records are presumptively accurate and complete. Nor did we state that when a person is ill, he reports all his problems to his doctor, who then faithfully records everything he is told. We reject as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions.

*Id.* at 1382-83. The Circuit held that a reasonable fact finder could find that petitioner's testimony of ongoing pain did not conflict with the records as the records are also silent about the *nonexistence* of such symptoms. *Id.* at 1383. Further, the Circuit acknowledged that the silence in the records could be explained by the fact that petitioner had exhausted all available treatment. *Id.*

In sum, special masters may consider the whole record in evaluating whether there is preponderant evidence for the severity requirement and may find the severity requirement satisfied even if a petitioner's medical records for the alleged injury is not continuous for the six months following the injury. *See Kirby,* 997 F.3d 1378. However, there must be evidence beyond petitioner's word alone, such as other corroborating records or reports, to establish the severity requirement by a preponderance of evidence. *See Colon,* 156 Fed. Cl. 534.

## IV.    The Factual Record

### A.    Testimony and Statements from Petitioner and Witnesses

#### 1.    Affidavit and Testimony of Constance Kohl at Hearing

Petitioner began working at Fischer Dairy Farm ("Fischer") in February of 2011[7]. Tr. 79.

Petitioner affirmed that prior to her vaccination on June 29, 2013, she was healthy but had suffered minor injuries on the job, including a broken nose and minor back pains, and had a history of hypertension and asthma. Pet. Ex. 11 at 1. Petitioner was single and had no children. *Id*. She had a horse and enjoyed trail riding. Tr. 40. She also rescued cats and dogs. Tr. 40.

Petitioner affirmed that she was an experienced dairy laborer on a working farm. Pet. Ex. 11 at 1. She testified that prior to her vaccine injury she was the calf manager at Fischer; her responsibilities were feeding and caring for the calves. Tr. 7. This included birthing and pulling calves and cleaning and washing their pens. Tr. 7. She awoke at 4:00 am and arrived at the farm around 5:00 am; once there, she put milk in the pasteurizer using five-gallon buckets. Tr. 7-8. This process could take anywhere from 10 to 20 buckets of milk to fill the pasteurizer. Tr. 8. Once the milk was pasteurized, she had to bottle-feed the baby calves. Tr. 10. Some of the calves also ate grain, which required lifting 50-pound bags of grain. Tr. 9. Petitioner also had to use a hand cart to tow 30-gallon barrels of water out to the older calves, who lived in a different barn. Tr. 10. Feeding the calves usually took three to four hours. Tr. 59. She was charged with the responsibility of updating all information about the calves into the computer system and making ear tags for the calves. Tr. 59, 92-93. She frequently checked on the cows to see if any of them were sick or in

---

[7] Petitioner's boss, Mr. Fischer, wrote that petitioner was hired in 2012. Pet. Ex. 16 at 1.

labor. Tr. 59-60. Around noon, petitioner would refill the pasteurizer for the calves' afternoon feeding. Tr. 11. Overall, petitioner typically worked 10 to 12 hours per day, seven days per week. Tr. 55. Petitioner testified that her boss, Mr. Fischer, was very busy and she would see him off and on, mostly driving by in the tractors or mixers. Tr. 35. If she had a question, she generally called him. Tr. 35. "[H]e runs around a lot. So most of the time [it] is phone conversation." Tr. 36

On June 28, 2013, petitioner cut her finger while feeding calves. Pet. Ex. 11 at 1. Her left index finger swelled and became red, so she went to the emergency room at Gunderson Boscobel Area Hospital that evening. *Id.* at 1-2. She was diagnosed with cellulitis of the finger and received a "DTaP" vaccination in her left deltoid. *Id*.

Petitioner recalled that night, "around midnight," she awoke with severe excruciating pain in her entire left arm starting at the shoulder. Pet. Ex. 11 at 2; Tr. 15, 54. She could not lift her arm or push with it; she had to keep her arm straight and could not use her forearm. Tr. 16, 34, 35. She was unable to work or change her clothes the next day due to pain. Pet. Ex. 11 at 2. She attempted to go to work on June 30, 2013 but was only able to check the calves for two hours and could not lift anything with her left arm due to pain. *Id*. Petitioner recalled receiving the Tdap vaccine on a Friday and being unable to work for the rest of the weekend. Tr. 53-54.

According to the petitioner, her pain became progressively severe; she could not move her arm or sleep because of the pain. Pet. Ex. 11 at 2; Tr. 17. She recalled visiting her chiropractor, Dr. Jones on July 3, 2013 for her regular maintenance appointment for her back. Tr. 16. She explained that she had regular appointments for her back because her work was physical. Tr. 16. She did not see him for her shoulder. Tr. 16. Petitioner described her treatments with Dr. Jones. He used a "standup" table; she would stand against the table, Dr. Jones would lower the table down and perform adjustments, the table would stand up again, she would turn around, and the table would lower down again for Dr. Jones to adjust her. Tr. 33. Dr. Jones typically checked her back, neck, and hips, but not her shoulders. Tr. 31-32. He did not use her arms for adjustments. Tr. 33. She explained the only time that Dr. Jones adjusted her shoulders was after she was bucked off her horse, and her right shoulder "popped." Tr. 32. He made sure her shoulder was in place but otherwise did not treat her shoulders. Tr. 32.

Petitioner stated that on July 6, 2013, she returned to the emergency room for her arm pain and was prescribed Toradol and Flexeril. Pet. Ex. 11 at 2; Tr. 63. She was told she had a vaccine reaction. Tr. 19.

Petitioner affirmed that her pain continued, and she presented to her primary care physician who prescribed naproxen and a sling. Pet. Ex. 11 at 2. She testified that Dr. Grunwald referred her to Dr. Perpich, an orthopedist, but "[i]t took a long time to get the appointment." Tr. 18-19. Dr. Perpich told her that she had "frozen shoulder[8] syndrome from having the vaccine in [her] bursa." Tr. 24. She recalled Dr. Perpich referring to her condition as impingement syndrome.[9] Tr. 24-25.

---

[8] The formal medical term for "frozen shoulder" is adhesive capsulitis, which is not what Dr. Perpich diagnosed petitioner with; he diagnosed petitioner with impingement syndrome. *See* Pet. Ex. 4 at 1-2.
[9] Impingement syndrome is a type of overuse injury with progressive pathologic changes resulting from mechanical rubbing or pressure. *Impingement syndrome*, DORLAND'S at 1834.

Petitioner did not know if there was a difference between bursitis and impingement syndrome. Tr. 30.

When asked why she did not seek additional care for her shoulder after her appointment with Dr. Perpich, petitioner explained that her employer did not offer health insurance and she "didn't want any more medical bills." Tr. 67, 79-80. She made about $10 per hour and there was no overtime or holiday pay. Tr. 59, 89. On average, she made about $400 per week before taxes. Tr. 89. When she saw Dr. Grunwald, she paid "what [she] could" out of pocket. Tr. 84-85. She pays Dr. Jones about $40 per visit. Tr. 28. She also affirmed that her PCP and Dr. Jones were "willing to work with me on the payments." Pet. Ex. 26 at 1.

Petitioner stated she did not return to Dr. Perpich after the first visit when he administered the steroid injection because she felt that it did not help and she "didn't want to pay for another injection that wasn't working." Tr. 26-28, 67. "…I didn't have the money to…keep going for injections that [weren't] helping, and so I just tried to do what I could do and hop[e] it got better and I didn't have to go for a surgery that I couldn't afford." Tr. 27. In her supplemental affidavit, dated April 9, 2022, petitioner affirmed that the visit and steroid injection cost her $416.48, which went into collections because she could not pay the bill. Pet. Ex. 26 at 1. She decided to live with it. When it was suggested by other medical providers that petitioner should see an orthopedist again, she stopped mentioning her shoulder to them as she felt there was nothing she could do— "the situation with my shoulder was hopeless and so why would I bring it up again?" *Id.* at 1-2.

Upon returning to work, petitioner told her boss she "wasn't able to do, you know, anything with my left arm." Tr. 36. Mr. Fischer, "… said just as long as everything's covered…as long as somebody did the work…that's all that mattered." Tr. 37-38. No accommodations were offered by Mr. Fischer though "he had a couple other people, you know, like doing the bedding and stuff that I had—that I needed two arms for…" Tr. 38. She testified that she could not lift the five-gallon buckets to fill the milk pasteurizer or the 50-pound bags of grain to feed the calves. Tr. 12. Her co-worker, Mr. Paulus had to do those tasks instead. Tr. 12, 36, 56-57. Petitioner stated that Mr. Paulus always worked the morning with her but did not work in the afternoons so she had different coworkers in the afternoons. Tr. 11-12, 56. Because she had difficulty with her tasks, Mr. Paulus had to stay "somewhat later" to assist her, though just in the mornings. He helped her for "four to five or six" hours depending on the work though he never stayed past noon. Tr. 57. He usually worked only from 5am until 10 or 11am the latest. Tr. 56. Petitioner stated she worked three or four hours less a day at first, and not a "full, regular" shift until "probably spring of 2014." Tr. 54. She did not return to ten to twelve-hour days until spring 2014. Tr. 55. When respondent's counsel pointed out that her timesheets did not reflect that she worked significantly less hours following her vaccination, she stated, "there were some days following my injury that I did still work 10-12 hour days as coverage was needed, but I was not able to complete all the tasks that I would usually perform." Pet. Ex. 26 at 3. Petitioner stated it was not until January or February of 2014, she was able to start using her lower arm again, but she still could not lift anything heavy. Tr. 13.

Petitioner recalled Easter Sunday, April 20, 2014, because she had to work alone. Tr. 13-14. "[N]obody else was available to work, so I did the chores myself. Nobody helped that day…" Tr. 13-14. Everyone else was off for the holiday. Pet. Ex. 11 at 2. She detailed her inability to use her left arm to dump five-gallon buckets of milk and how she struggled to dump them into the

pasteurizer with only her right arm. Pet. Ex. 11 at 2. She described dumping the milk a quarter of a pail at time to accommodate for her arm. Tr. 14. Petitioner stated that it was the summer of 2014 before she "was really doing a lot more" with her arm. Tr. 14.

After the hearing and in response to respondent's counsel who pointed out that Mr. Paulus's time sheets documented his working Easter of 2014, petitioner submitted a supplemental affidavit affirming she did not mean to say she was working alone the entire day. She meant nobody worked with her that afternoon, but Dennis worked with her in the morning. Pet. Ex. 26 at 2. "As I testified, Dennis would work with me in the mornings and some afternoons. On the day in question, Dennis did work with me in the morning, but because it was Easter there was nobody working with me that afternoon." Pet. Ex. 26 at 2.

Petitioner affirmed that one of the benefits of working on a farm is the ability to ride horses. Pet. Ex. 11 at 3. She affirmed due to the pain in her left arm, she could not ride her horse because she could not lift the saddle up with one arm and needed *two* hands to ride with the reins; she testified she "didn't ride for probably over a year." Tr. 40 (emphasis added). Initially, she recalled not being able to ride again until the fall of 2014. After respondent's counsel presented her with her Facebook post showing her sitting on "Butterscotch" in September 2013 and another post about a trail ride on a different horse in April 2014, petitioner stated that Butterscotch was a young horse and not "broke to ride" so she may have sat on him while someone held him, but never rode him. She walked him with her right arm. Tr. 40, 61-62. She did not recall being able to ride until October of 2014 but agreed that if her Facebook post showed her riding in April of 2014, then she must have ridden. Tr. 62. "I thought it was October, and maybe it was April. But I know it wasn't right— I didn't ride anything after I was injured." Tr. 62. She also clarified that the ride in April of 2014 would have been on a "broke" horse, not a two-year-old unbroken horse. Tr. 62.

Respondent's counsel asked if petitioner may have confused the events of her 2013 left shoulder injury following the vaccination with her 2016 right shoulder injury. In her supplemental affidavit petitioner responded to this question with "[c]omparing the two would be like comparing apples to oranges, the pain was very different, and I do not believe that I confused the two nor the events surrounding them." Pet. Ex. 26 at 2. She highlighted that her recovery from the 2016 injury included expenses paid by worker's compensation, such as physical therapy. *Id.*

Petitioner stated working through pain is typical for someone who works on a farm. Tr. 77. She worked for a year and a half with a torn meniscus, on her feet all day, because she could not afford to get it fixed. Tr. 77-79. She was finally able to afford knee surgery in March of 2017, after learning about and qualifying for a program in a different county, Grant County, which covered part of the surgery cost. She learned of the program in 2017. Tr. 77, 81-82. She further affirmed in her supplemental affidavit that she qualified for Badger Care, her state's Medicaid program, in the fall of 2019 and immediately sought treatment for her shoulder thereafter. *Id.* at 2.

### 2.    Letters and Affidavit from Todd Fischer

Mr. Fischer, petitioner's employer, provided a letter filed on December 16, 2016 in which he wrote:

> In June 2013 my employee Connie Kohl had received a tetanus shot for something that was not work related. It affected her left arm making it difficult to use. I was able to adjust her duties by having others do what she wasn't able to do. She missed some work days, and then worked as much as she could with the help of the other employees.

Pet. Ex. 8 at 1.

On December 23, 2016, another letter from Mr. Fischer was filed in which Mr. Fischer stated:

> In June 2013, my employee Constance Kohl had received a tetanus shot for something not work related. Following her vaccination, she complained of injury of her left arm. She experienced difficulties performing work duties that involved use of her left arm, which I adjusted by having others do what she could not. As a result of her left arm injury, many of Ms. Kohl's work duties had to be adjusted past January 1, 2014.

Pet. Ex. 10 at 1.

On October 31, 2017, petitioner filed an "Affidavit of Todd Fischer." Pet. Ex. 16. The document opens with: "I, Todd Fischer, do swear and affirm the following…" *Id.* Mr. Fischer affirmed he owned Fischer Dairy Farms, which had multiple dairy farms in the state of Wisconsin. *Id.* at 1. He employed petitioner and had employed her since 2012. *Id.* While petitioner lived and worked on Mr. Fischer's farm in Glen Haven prior to her vaccination, she currently lived and worked on the farm in Boscobel.[10] *Id.*

According to Mr. Fischer, petitioner received a "DTaP" vaccine in her left arm on June 28, 2013. *Id.* She called into the office on June 29, 2013 to report that she could not come to work due to pain in her arm and inability to dress herself. *Id.* She reported to work on June 30, 2013 for part of the day to check on the baby calves. *Id.* She returned to work full time on July 1, 2013 but was only able to complete limited tasks. *Id.*

According to Mr. Fischer, prior to her vaccination, petitioner was responsible for birthing, feeding, administering shots to, and tagging calves. She also had to carry, scoop, and dump grain buckets, carry milk pails two at a time, and log reports into the computer. *Id.* After her vaccine, petitioner received help from her coworker, Dennis Paulus, for all tasks that required heavy lifting or use of her left hand. *Id.* at 2. She was unable to carry grain buckets or birth calves and needed assistance administering shots to larger calves. *Id.* However, because petitioner worked with infant calves from nursing to weaning, she could still perform many of her work duties. *Id.* She could

---

[10] While petitioner lived on one of Mr. Fischer's farm as her place of residence, it appears that petitioner would travel to different farms to perform her main work responsibilities. "In 2013, I was living in Fennimore, which was 26 miles from one farm to the other. The farm I worked at and lived at, the calves were all at the other farm, so I drove every day from Fennimore. And then in 2015, he bought another farm five miles from work, and then I moved there in 2015." Tr. 94.

still scoop the grain, although coworkers had to help carry the buckets, carry milk pails in her right hand, feed calves with one hand, and log reports into the computer. *Id*.

According to Mr. Fischer, petitioner required help with her duties "until well after January 1, 2014." *Id*. Mr. Fischer added that it was not until after Valentine's Day, February 14, 2014, that petitioner could carry milk pails with both arms to the pasteurizer and help with birthing the calves. *Id*. Mr. Fischer wrote that petitioner was a valued employee and he accommodated her as needed until late winter 2014. *Id*. According to Mr. Fischer, following February 14, 2014, petitioner was able to resume most of her normal duties using her left arm. *Id*.

Mr. Fischer signed the statement and a third party, Anna Isabel Bautista, signed the statement as a witness.

### 3.    Letter from Dennis Paulus

Mr. Paulus was petitioner's co-worker. Pet. Ex. 9 at 1. Mr. Paulus submitted a letter dated September 7, 2016 and filed on December 16, 2016, stating that he worked with petitioner "from June 28, 2013. And did her duty's (sic) and mine. Lifting and carrying of product on the farm, milk, grain and wate (sic)." *Id*. Mr. Paulus passed away in September of 2018 and thus was unable to testify. Tr. 8.

### 4.    Letters from Julie Fischer

On June 4, 2018, petitioner filed a letter from Julie Fischer in response to questions raised by the court. Pet. Ex. 18 at 1. Ms. Fischer submitted that information provided by Todd Fischer was based on his memory, there were no phone records or text messages from employees kept, and no other information except time sheets. *Id*.

According to Ms. Fischer, petitioner "was told to do what she could and our other employees picked up her slack. We don't monitor what is done – they just do their job." *Id*.

## B.    Other Evidence

Petitioner filed a letter from Worker's Compensation confirming that she did not file any claims for the year 2013. Pet. Ex. 12 at 1.

Petitioner submitted her yearly payroll earning and deduction statements along with her W-2s for 2012, 2013, 2014, 2015, and 2016 on July 5, 2017. Pet. Ex. 14. The records do not reflect any lost income related to the time frame at issue. *See id*. at 1-3.

On March 20, 2018, petitioner filed a print-out of her Facebook account from March of 2010 through February 27, 2018. Pet. Ex. 17. Petitioner's Facebook timeline included a post which appears to be a photo-post with her horse, Carson, a month after her June 28, 2013 vaccination: "Wednesday, July 31, 2013 at 10:34pm EDT. Carson on our ride tonight." *Id*. at 202.  Petitioner also posted about her quarter pony, Butterscotch, whom she had acquired in February of 2013: "Monday, September 2, 2013 at 10:02am EDT. I sat on butterscotch for the first time, he is such a

good horse and he is only two!" *Id.* at 201. An April 26, 2014 post includes petitioner, her friend Bill, Butterscotch and Carson:

> Saturday, April 26, 2014 at 7:21 EDT. Connie Kohl added 2 new photos. Butterscotch and Carson!
> Saturday, April 26, 2014 at 7:24 EDT. Connie Kohl is feeling proud. Had an awesome ride, even ride there (sic) the freestall (sic) barn by the cows! Then played a little!
> Saturday, April 26, 2014 at 7:30pm EDT. Bill did too!

*Id.* at 174. Petitioner's Facebook posts do not mention any injuries in 2013 or any falls in 2016, but do mention her osteoarthritis, left knee injections, and arthroscopic knee surgery throughout 2016 and 2017. *See id.* at 80, 82, 84, 97. Petitioner posted about her having a good work ethic: "Tuesday, March 17, 2015 at 11:45am EDT. You know I worked every day last week with sinus infection[,] ear infection, bronchitis, and 103 fever! … must be good work ethic!" *Id.* at 118.

Petitioner filed her time sheets on June 4, 2018. Pet. Ex. 19. Petitioner's time sheets show, with some fluctuations based on the week, that her hours were not significantly reduced following her vaccine on June 29, 2013, with the exception of the day she called in that she could not work and the following day she worked for only two hours. Pet. Ex. 19 at 20. The week prior to petitioner's injury, she worked just over forty-seven hours. Pet. Ex. 19 at 20. A week after her vaccination, the week July 7, 2013 – July 13, 2013, she worked nearly forty-seven hours. *Id.* at 19. The next week, July 14, 2014 – July 20, 2013, petitioner worked almost fifty hours. *Id.* at 18-19. Petitioner worked one-hundred-and-eight hours during the pay period of August 1, 2013 through August 19, 2013, less than two months after her June 28, 2013 vaccination. *Id.* at 17. For the pay period of December 29, 2013 through January 13, 2014, petitioner worked one-hundred-and-thirteen hours. *Id.* at 7. Corresponding time sheets two years later show that petitioner worked one-hundred-and-fourteen hours for the pay period of December 29, 2015 through January 14, 2016. *Id.* at 5. Timesheets for most of 2014, including April 2014, were not filed.

Petitioner filed Mr. Paulus's timesheets. Pet. Ex. 20. His timesheets reflect that he worked both mornings and afternoons—around three-to-four hours in the morning and three-to-four hours in the afternoon. *See generally* Pet. Ex. 20. In the six months prior to petitioner's vaccine on June 28, 2013, Mr. Paulus generally clocked-in for the morning around 5am, worked between three-to-four hours, and then clocked-out mid-morning. He then clocked-in for the afternoon around 1pm, worked between two-to-four hours, and then clocked out. *See id.* at 20-22. His schedule deviated from the aforementioned six times and he worked more than nine hours a day six times. *Id.* at 17-20. On June 29, 2013, Mr. Paulus worked for over seven hours in the morning and on June 30, 2013, he worked over six hours in the morning. *Id.* at 17. In the six months following petitioner's June 28, 2013 vaccine, Mr. Paulus deviated from his usual morning schedule over twenty times—clocking-in around 5am, working for three-to-four hours, clocking-out mid-morning, then shortly thereafter clocking-back in for one-to-two hours before clocking out for lunch. He continued to clock-in for the afternoon around 1pm. When he clocked-in twice in the morning, Mr. Paulus worked a total of four-to-six hours in the morning. *See id.* at 10-17. Mr. Paulus worked more than nine hours a day twelve times in the six months following petitioner's vaccination. Mr. Paulus's

timesheet for April 20, 2014, indicated that he worked for three hours in the morning, but not in the afternoon. *Id.* at 7.

## C.    Petitioner's Medical History

### 1.    Petitioner's Pre-Vaccination Medical History

Petitioner received primary care from Dr. Ann Grunwald at Great River Medical Clinic (a part of Crossing Rivers Health). *See generally* Pet. Ex. 2; *see also* Pet. Ex. 23. Her history included a host of unrelated issues. Pet. Ex. 2 at 3, 30; Pet. Ex. 6 at 10-11. Petitioner also had a history of back issues and degenerative changes of her neck at C4-5 and C5-6 confirmed by x-rays on April 12, 2010, and right cervical radiculopathy[11] confirmed by MRI on April 15, 2010 and EMG on April 27, 2010. Pet. Ex. 5 at 13; Pet. Ex. 4 at 4; Pet. Ex. 2 at 31. In 2011, petitioner was diagnosed with right wrist tendonitis, early arthritis and degenerative disc disease of the cervical spine, causing pain in two fingers, for which she took ibuprofen regularly. Pet. Ex. 2 at 1.

On March 8, 2012, petitioner presented to Dr. Grunwald with among other complaints, a small, non-draining, and non-inflamed cyst of the right upper arm and a slightly raised lesion with tenderness of the right posterior thigh. Pet. Ex. 2 at 4. Dr. Grunwald diagnosed petitioner with a low-grade staphylococcal infection and prescribed doxycycline[12] along with hydrochlorothiazide[13] for her blood pressure and Flagyl.[14] *Id.* at 4-5.

On July 26, 2012, petitioner presented to Dr. Grunwald with complaints of low back pain and spasms for two weeks, right shoulder pain and neck pain. Pet. Ex. 2 at 6. She had seen the chiropractor three times in the past week. *Id.* She was assessed with lower back pain and strain due to work. *Id.* She was also noted to have right shoulder bursitis that had been healing over the past two months with good range of motion. *Id.*; *see also* Pet. Ex 7. She was prescribed Flexeril[15] and Hydrocodone/Acetaminophen. Pet. Ex. 23 at 84.

A log-note from Dr. Grunwald's office on September 12, 2012 reflects petitioner's phone call for a refill of Flexeril. Pet. Ex. 23 at 8. The record also reflects that chiropractic care was helping. *Id.*

On December 11, 2012, petitioner presented to Dr. Grunwald with complaints unrelated to the issues herein. Pet. Ex. 2 at 8.  Services through Grant County were recommended. *Id.* at 9-10. She was given refills for other prescriptions including Flexeril. *Id.*

---

[11] Cervical radiculopathy is "radiculopathy of cervical nerve roots, often with neck or shoulder pain; compression of nerve roots is a common cause in this area" *Cervical radiculopathy*, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1547 (33rd ed. 2020) [hereinafter DORLAND'S].

[12] Doxycycline is "a semisynthetic broad-spectrum antibacterial." *Doxycycline*, DORLAND'S at 559.

[13] Hydrochlorothiazide is "a thiazide diuretic, used for treatment of hypertension and edema." *Hydrochlorothiazide*, DORLAND'S at 867.

[14] Flagyl is a trademark name for metronidazole, which is "an antiprotozoal and antibacterial effective against obligate anaerobes; administered orally and intravaginally in bacterial vaginosis." *Metronidazole*, DORLAND'S at 1139.

[15] Flexeril is a trademark name for cyclobenzaprine hydrochloride, which is "a compound… used as a muscle relaxant for relief of painful muscle spasms." *Cyclobenzaprine hydrochloride*, DORLAND'S at 450.

On January 11, 2013, petitioner returned to Dr. Grunwald for an annual preventative examination. Pet. Ex. 2 at 11. Her physical examination was normal with normal range of motion in all extremities noted. *Id*. at 13. Necessary medications were refilled. *Id*. at 13.

On March 6, 2013, March 28, 2013, April 15, 2013, May 13, 2013, and June 3, 2013, petitioner presented to Dr. Jones, for chiropractic "wellness visits". Pet. Ex. 7 at 3-7. She was asymptomatic and presented for subluxations.[16] *Id*. at 3. Petitioner was found to have subluxations with spasm, hypomobility, and end point tenderness at the C3, T3, T4, T8, and L3 vertebrae and at the sacrum. Adjustments were performed. *Id*. at 3-7.

On June 28, 2013, petitioner presented to Boscobel Emergency Room with pain, redness and swelling of the left long finger along the nail that started one day prior. Pet. Ex. 3 at 9. She was diagnosed with cellulitis of the finger, prescribed Augmentin[17] and Epsom salt soaks, and advised to return Sunday, if her finger grew worse. *Id*. at 10-11. She was administered the subject Tdap vaccine in her left deltoid at that time. *Id*. at 18; Pet. Ex. 1 at 1.

## 2.     Petitioner's Post-Vaccination Medical History

On July 3, 2013, petitioner presented to Dr. Jones for her wellness chiropractic treatment. Pet. Ex. 7 at 8. Petitioner was noted to have subluxations with spasm, hypomobility and end point tenderness at the C3, T3, T4, T8, and L3 vertebrae and at the sacrum, which were adjusted. *Id*.

On July 6, 2013, petitioner presented to Boscobel Emergency Department with left shoulder and arm pain following a tetanus shot. Pet. Ex. 3 at 1. She reported sharp, aching stiffness and tingling aggravated by movement and lifting. *Id*. at 2-3. She had chills and headache with an upset stomach from the antibiotics she was taking. *Id*. at 1. She had numbness and tingling of the left hand. *Id*. at 4. On examination, she had tenderness, limited range of motion, and pain in the muscle of the left deltoid. *Id*. Petitioner was diagnosed with "Bruising/pain s/p Tdap injection" and prescribed Toradol[18] and Flexeril. *Id*. at 2. Her discharge instructions read: "Reaction to vaccination, arm pain stiffness bruise, use ice and heat on left arm, alternate." *Id*. at 3.

On July 8, 2013, petitioner presented to Dr. Grunwald for pain in her left arm. Pet. Ex. 2 at 14. She reported receiving a painful tetanus shot at urgent care following an infected cuticle 10 days ago, developing a bruise after the injection, and losing the use of her arm. *Id*. However, she continued to work on a farm feeding calves with both arms. *Id*. On examination, she had left arm pain with movement and pain around the injection site, but no redness or warmth around the site. *Id*. at 15. Dr. Grunwald's assessment was sprains and strains of the shoulder and upper arm,

---

[16] Subluxation means "in chiropractic [medicine], any mechanical impediment to nerve function." *Subluxation*, DORLAND'S at 1761.

[17] Augmentin is a trademark name for combination preparations of amoxicillin and clavulanate potassium. *Augmentin*, DORLAND'S at 179. Amoxicillin is "a semisynthetic derivative of ampicillin effective against a broad spectrum of gram-positive and gram-negative bacteria." *Amoxicillin*, DORLAND'S at 64. Clavulanate potassium is "a $\beta$-lactamase inhibitor used in combination with penicillin in treating infections caused by $\beta$-lactamase-producing organisms." *Clavulanate potassium*, DORLAND'S at 364.

[18] Toradol is a trademark for preparations of ketorolac tromethamine. *Toradol*, DORLAND'S at 1910. Ketorolac tromethamine is "a nonsteroidal anti-inflammatory drug administered… for short-term management of pain." *Ketorolac tromethamine*, DORLAND'S at 971.

probably due to injection, but she expressed concern that this could be a reaction to the vaccine that was not just "strain from administration." *Id*. Petitioner was prescribed naproxen,[19] provided a sling for resting her left arm, and told to follow up in five days. *Id*.

On August 5, 2013, petitioner presented to Dr. Jones for wellness chiropractic treatment. Pet. Ex. 7 at 9. The notes for this visit are identical to those for her previous visits to Dr. Jones.[20] *Id*.

On August 8, 2013, petitioner returned to Dr. Grunwald with continued complaints of pain after Tdap vaccination, especially with movement of the left deltoid and at night. Pet. Ex. 2 at 17. Petitioner reported that she needed to use her arm to work on the farm. *Id*. Dr. Grunwald's assessment was arm pain from post-Tdap reaction. She spoke with Dr. McNamara "who states he has seen myositis infection from injection. Rec a surgical consult." *Id*. at 18. Dr. Grunwald planned to speak to Dr. Perpich, an orthopedist, when he was in the office the following day. *Id*.

A log note from Dr. Grunwald the next day, August 9, 2013, notes that she spoke to Dr. Perpich who agreed to see petitioner on August 15, 2013. Pet. Ex. 23 at 7. She documented that petitioner was to try gabapentin until petitioner's appointment with Dr. Perpich. *Id.*

Petitioner presented to Dr. Perpich on August 15, 2013. Pet. Ex. 4 at 1. She was noted to be a 46-year-old female who handled calves and worked on a farm. *Id*. at 1-2. She reported a finger infection seven weeks prior, treated in the emergency room, where she received a Tdap vaccination in her left shoulder, and suffered substantial pain in the shoulder within five hours of vaccination. *Id*. Her pain had somewhat improved but was persistent and troublesome at work. *Id*. Her shoulder pain woke her from sleep and caused trouble with overhead use. *Id*. at 2. On examination, Dr. Perpich observed 180 degrees of abduction and forward flexion, "75 degrees of external rotation easily," slight decrease in strength with external rotation, positive Neer and Hawkins tests, a positive supraspinatus isolation test, and tenderness around the acromion. *Id*. The assessment was impingement syndrome[21] of the left shoulder that was more of a bursitis[22] type problem, possibly related to the Tdap injection. *Id*. Petitioner reported feeling better after a steroid injection into her subacromial space administered during this visit. *Id*. However, even after the steroid injection, she continued to have trouble with adduction. *Id*. Dr. Perpich suggested a follow-up in six weeks and repeat injections if needed. *Id*. Dr. Perpich "anticipate[d] that this should clear up with anti-inflammatories." *Id.* at 3.

Petitioner presented to Dr. Jones for chiropractic wellness visits on September 11, 2013, September 23, 2013, October 16, 2013, November 18, 2013, December 16, 2013, December 27, 2013, January 15, 2014, March 26, 2014, March 28, 2014, April 4, 2014, April 7, 2014, and April

---

[19] Naproxen is "a nonsteroidal anti-inflammatory drug that is a propionic acid derivative, used in the treatment of pain, inflammation, osteoarthritis, rheumatoid arthritis, gout, calcium pyrophosphate disposition disease, fever, and dysmenorrhea and in the prophylaxis and suppression of vascular headache." *Naproxen*, DORLAND's at 1214.

[20] It appears that Dr. Jones' record is an electronic record that repeats itself for each visit. Occasionally but rarely, new information is added but for the most part the record is repetitious and of little value.

[21] Impingement syndrome is a type of overuse injury with progressive pathologic changes resulting from mechanical rubbing or pressure. *Impingement syndrome*, DORLAND's at 1834.

[22] Bursitis is "inflammation of a bursa, occasionally accompanied by a calcific deposit in the underlying tendon." *Bursitis*, DORLAND's at 260.

16, 2014. *See* Pet. Ex. 7 at 10-21. The records for each of these visits were identical to the records from her previous chiropractor visits. *Id.*

On March 21, 2014, petitioner was seen by Susan McMillan, N.P., who replaced Dr. Grunwald as petitioner's primary care physician ("PCP"). She complained of asthma exacerbation, which was interfering with her sleep. Pet. Ex. 23 at 74. Petitioner reported not taking Flexeril, Celexa, or Gabapentin at that time. *Id.*

A log-note from the PCP's office reflects a telephone call on April 3, 2014, requesting a refill of Flexeril. Pet. Ex. 23 at 6. Petitioner reported that she had been to the chiropractor three times in the past week but was still having muscle spasms. *Id.* A refill was prescribed. *Id.*

On September 10, 2014, petitioner presented to Dr. Jones for chiropractic wellness visit. Pet. Ex. 7 at 22. The record for this visit was identical to the previous chiropractic records. *Id.* She returned to him on October 13, 2014 complaining of lumbosacral discomfort which she described as dull, aching, and mild. Pet. Ex. 7 at 23. Dr. Jones found subluxations with spasm, hypomobility, and end point tenderness at the C3, T3, T4, T8, L3 vertebrae and the sacrum and performed adjustments. *Id.* Palpation of petitioner's muscles revealed hypertonicity in her right and left upper thoracic[23] areas, right and left mid-thoracic areas, and right and left lower thoracic areas. *Id.* He assessed this as an exacerbation, an episode of marked deterioration of her condition due to "acute flareups of presenting conditions." *Id.*

On December 3, 2014, petitioner presented to her PCP with complaints unrelated to this matter. In a review of systems, petitioner reported:

> [L]imited range of motion. States this is from a tetanus shot given 1-2 years ago. Needs a statement for her attorney stating she still has decreased range of motion. Evaluated by Dr. Perpich initially who recommended PT. Patient reports going through PT[24] massage and "everything."

Pet. Ex. 23 at 72-73. The record documents a general physical exam with specific findings regarding a skin tag. *Id.* at 73. There was no documentation associated with musculoskeletal examination or range of motion of petitioner's shoulder. *See id.* at 72-73. It was recommended that petitioner attend occupational therapy or return to Dr. Perpich for her shoulder issue. *Id.* No refill or medication was prescribed. *Id.* at 73.

Petitioner presented to her PCP's office on December 29, 2014, for a urinary tract infection. Pet. Ex. 23 at 70-71. Arm and shoulder pain were listed as "Current Problems", however, also listed were staphylococcal infection and screening for hyperlipidemia, which were not current issues. *Id.* at 70.

On January 5, 2015, petitioner presented to her PCP for skin tag removal. Pet. Ex. 23 at 68-70.

---

[23] Thoracic means "pertaining to or affecting the thorax (chest)." *Thoracic*, Dorland's at 1890.

[24] Although petitioner reported undergoing PT and massage, no records of physical therapy or massage prior to this date have been filed. Further, there does not appear to be a referral to physical therapy prior to this reference.

On March 18, 2015, May 20, 2015, June 23, 2015, June 26, 2015, June 30, 2015, August 12, 2015, August 19, 2015, and September 9, 2015, petitioner presented to Dr. Jones for wellness visits. *See* Pet. Ex. 7 at 24-31.

On October 16, 2015, petitioner presented to the emergency room at Crossing Rivers Health with complaints of knee pain which also affected her left calf. Pet. Ex. 5 at 39. Petitioner was diagnosed with a Baker's cyst.[25] *Id.* at 40. The treating physician ordered a venous doppler which confirmed a Baker's cyst. *Id.* at 44.

Petitioner presented to Dr. Perpich on October 23, 2015 for left knee pain. His impression was a medial meniscus tear or osteoarthritis and noted that the x-ray taken showed mild medial joint space narrowing. Pet. Ex. 27 at 3. He recommended an MRI. *Id.* at 3-4.

On December 14, 2015, petitioner presented to Dr. Jones for her wellness visit.  Pet. Ex. 7 at 32.  The record for this visit was a repetition of the past records.

On January 28, 2016, petitioner presented to the emergency room at Crossing Rivers Health with left medial knee pain starting three months ago at work. She reported having seen Dr. Perpich who ordered an MRI. Pet. Ex. 5 at 53. She followed up with Dr. Perpich for her MRI results on February 3, 2016, which showed severe changes in the medial compartment with osteoarticular erosions, in addition to a medial meniscal tear. His impressions were generally osteoarthritis and meniscus tear. Pet. Ex. 27 at 7. Petitioner received an injection in the left knee. *Id.*

Petitioner presented to her PCP on February 17, 2016 following a fall on February 15, 2016. She had slipped on ice and landed on the right side of her body. Pet. Ex. 23 at 65. She reported right shoulder, elbow, and right neck pain. *Id.* X-rays of her neck, ribs, and right shoulder were ordered. Taking off work was recommended. *Id.* at 66. The record notes taking off work "is very difficult for her, she feels guilty." *Id.*

Petitioner presented to Dr. Jones for wellness visits on February 15, 2016, February 17, 2016, and February 22, 2016. *See* Pet. Ex. 7 at 33-35. The records for all three dates document her fall in the past week with injury to the right arm and ribs. *Id.*

On February 24, 2016, petitioner followed-up with her PCP about her ribs, neck, and right shoulder pain. Pet. Ex. 23 at 63-64. The rib pain had improved but she was advised to avoid lifting heavy items. She had not followed up with Dr. Perpich due to the cost and no insurance. *Id.* at 64.

 Petitioner presented to Dr. Jones for a wellness visit on March 3, 2016. Pet. Ex. 7 at 36. She reported feeling better since her fall and broken rib but had been experiencing tightness in the lumbar spine and wanted treatment before it got worse. *Id*. On examination, Dr. Jones found tenderness at the C3, C7, T4, T6, T11, and L5 vertebrae and the left pelvis. *Id*.  Petitioner returned to Dr. Jones on March 8, 2016, March 18, 2016, March 25, 2016, and April 1, 2016, complaining

---

[25] Baker's cyst is "a swelling behind the knee, caused by escape of synovial fluid which becomes enclosed in a membranous sac." *Baker's cyst*, DORLAND'S at 453.

of thoracic, thoraco-lumbar, and cervical discomfort described as "dull and aching." *See* Pet. Ex. 7 at 37-40. He performed a 3-4 region manipulation. *Id.*

On April 6, 2016, petitioner presented to Dr. Perpich for right shoulder and right-sided neck pain related to her fall in February of 2016. Pet. Ex. 27 at 10-11. X-rays showed no significant abnormality though her cervical spine x-rays showed disk space narrowing. *Id.* at 11. Following examination, Dr. Perpich wrote: "Neck pain. I do not think there is a whole lot of shoulder contribution here. I think this is related to cervical degenerative disk disease and an irritation of that from her accident." *Id.*

Petitioner presented to Dr. Jones on April 13, 2016 and April 15, 2016. Pet. Ex. 7 at 41-42. Records from both visits note that petitioner awoke with a sore 5th rib the morning of her appointments; the remainder of the records read identical to those before it. *Id.*

On April 18, 2016 petitioner presented to her PCP for neck pain that began two months ago and caused her to decrease her work hours. Pet. Ex. 23 at 61. She was referred to occupational therapy and given a neck brace. *Id.* at 62.

On April 19, 2016, petitioner presented for occupational therapy for her neck issues, which were causing significant difficulty working, participating in recreational activities, driving, lifting objects and abduction. Pet. Ex. 5 at 67. In the self-reported medical history section, petitioner wrote that she was seeking therapy for neck pain and circled the back of her neck and the center of her upper back as the location of her symptoms. Pet. Ex. 23 at 15-16. She noted a fall two months prior, broken rib and whiplash. Pet. Ex. 5 at 67. She noted that since the fall, her pain continued to worsen, hindered her performance, and she had to work with a neck brace. *Id.* Petitioner's recent x-rays showed significant cervical degeneration. *Id.* She was noted to have headaches three to four times a week, which chiropractic care helped. *Id.* Both of petitioner's shoulders were tested with about 20 degrees of limitation of left shoulder abduction with a notation "this is her norm on both sides." *Id.* at 68. Petitioner's manual muscle test noted some discomfort and pain during left shoulder abduction and "fuzziness" in the fingers and hands when raising her upper extremities past 90 degrees. *Id.* Petitioner was deemed an excellent candidate for therapy and myofascial release; however, her financial situation was a hinderance to attending therapy regularly. *Id.* at 68. Myofascial release therapy was initiated and completed for the paraspinal, intercostal, scapular, upper trapezius, occipital, and cervical areas. *Id.* at 69. Petitioner was advised to attend as much therapy as she could afford and instructed on daily home exercises to complete. *Id.*

Petitioner presented to physical therapy for her neck issues on April 19, 2016, April 25, 2016, April 29, 2016, May 2, 2016, May 5 2016, May 9, 2016, May 12, 2016, and May 16, 2016. *See* Pet. Ex 23 at 17-20. The May 16, 2016 appointment records indicate that petitioner had shown significant improvement and was to be discharged at the next visit; petitioner did not show for that next visit. *Id.* at 20.

On June 20, 2016, July 26, 2016, August 23, 2016, and September 12, 2016, petitioner presented to Dr. Jones for wellness visits. *See* Pet. Ex. 7 at 43-46. The records were identical to the April 2016 record. *Id.*

In October of 2016, petitioner reported left knee pain after running to help her dog after her dog was hit by a car. Pet. Ex. 23 at 58. Petitioner suffered a dog bite when trying to rescue the dog and presented to the emergency department for care. She was prescribed antibiotics for her dog bite and advised to follow up with her PCP if her dog bite worsened. *Id.* at 92-95.

Petitioner underwent knee surgery on her left leg on March 22, 2017 at Grant Regional Health Center. Pet. Ex. 23 at 29.

In a note dated September 2, 2017, petitioner's chiropractor, Dr. Jones wrote that he had treated petitioner for several years for recurring back pain generally caused by overuse from her work. Pet. Ex. 21 at 1. Dr. Jones noted that there were times when a specific injury made her seek treatment, but petitioner typically presented for routine preventative care, without specific complaints. *Id.* The appointments were quick, fairly unremarkable and if there were oddities in her subjective information or concerns, they are documented. *Id.* Dr. Jones wrote at the time of petitioner's vaccination, she presented for regularly scheduled visits for minor back complaints, neck complaints, and headaches, which were common for her. *Id.* He remembered petitioner mentioning her shoulder hurting during the August 5, 2013 visit that she attributed it to her tetanus vaccine. *Id.* He recalled recommending that she follow-up with a professional involved in the administration of the injection regarding her symptoms. *Id.* After that date, all of petitioner's visits were back and neck related. He did not address her shoulder. *Id.* Dr. Jones concluded that he could not confirm or deny shoulder pain because their clinical encounters dealt with spinal related issues. *Id.*

On January 9, 2018, petitioner called to request a refill of Flexeril, which was last refilled on August 22, 2017 for back pain. Pet. Ex. 23 at 27.

On October 9, 2018, petitioner followed up with her PCP for chronic neck and back pain. *Id.* at 38. Petitioner was again prescribed Flexeril for her neck and back. *Id.* at 39. She requested a Flexeril refill on October 29, 2018. *Id.* at 40.

She returned to her PCP on December 13, 2018 for right knee pain, which had been ongoing for a year and worsened in the past week. She underwent x-rays of her right knee, osteoarthritis was the assessment, and a lidocaine injection given. *Id.* at 23, 49.

On January 25, 2019, petitioner presented for diffuse arthralgia. Pet. Ex. 23 at 51. She underwent rheumatoid arthritis screening on January 26, 2019. *Id.* at 21, 52. She was also referred to and attended a pain management consult on January 29, 2019 for her sacroiliac (lower back and buttock) pain. *See id.* at 53-55. She received steroid injections in her right sacroiliac joint on January 29, 2019 and February 8, 2019. *Id.* at 55-57. Her active medications included: Celexa, Flexeril, Benadryl, and Motrin. *Id.* at 55.

Petitioner followed-up at her PCP for ongoing neck pain on April 23, 2019, requesting a refill of Flexeril. Pet. Ex. 25 at 1. The PCP noted "… chronic myositis of the neck region and lumbar region. She does find that cyclobenzaprine does help. She also goes to the chiropractor." *Id.* Flexeril was refilled for her muscle strains/spasms in her upper back and neck. *Id.* 3. Shoulder

pain was not noted though petitioner's left knee, cervical, muscles aches and strains, and sacroiliac issues were. *Id.* at 1.

On May 8, 2019, petitioner presented to her primary care clinic for knee pain. Pet. Ex. 25 at 3. She reported that the steroid injection in December of 2018 provided significant relief, but the pain had returned and was interfering with chores on the farm and sleep. *Id.* at 3-4. Petitioner received another steroid injection in her right knee. *Id.* at 4.

The following month, on June 24, 2019, petitioner returned to her primary care clinic for hip pain on the right without injury or falls. Pet. Ex. 25 at 5. She reported that the pain was different from her sacroiliac joint pain and caused her to walk with a limp. Petitioner was assessed with a trochanteric bursitis of the right hip and received a steroid injection in the right greater trochanter. *Id.*

On October 28, 2019, petitioner presented to Research Park Sports Medicine and Research Park Radiologic Services for "Mobility Problem of the Left Shoulder (After receiving a tetanus injection 6/2013)." Pet. Ex. 24 at 10. X-rays for "left shoulder pain, unspecified chronicity" were performed. *Id.* at 3-4. Dr. Erin Hammer found "no acute fracture or dislocation. Mild hypertrophy of the left acromioclavicular joint. Left glenohumeral joint space is preserved. Type 1 acromion." *Id.* at 5. The diagnoses were "left shoulder pain, unspecific chronicity (primary)," "adhesive capsulitis of left shoulder," and "rotator cuff syndrome, left." *Id.* at 9. Petitioner's current medications were noted to be Celexa, Flexeril, Benadryl, and Motrin, and the medications were refilled. *Id.* at 1. Petitioner provided a history of:

> shoulder pain...ongoing for about 6 years. Connie reports that she had no previous shoulder problems until 6 years ago when she received a tetanus immunization into the left shoulder joint...Her shoulder pain and loss of function followed a very typical adhesive capsulitis past where it was quite painful for about 6 months. She lost her range of motion for a year or more and then slowly her range of motion started to improve...Pain today is rated 1 out of 10; at its worst, it is a 10 out of 10. Pain is sharp. She continues to note loss of range of motion and notes that her pain is worse at the ends of her range of motion... At the time of her injury, she was uninsured and so was (sic) had not pursued other option for treatment.

*Id.* at 11. On examination, range of motion was noted to be "quite good" though about 60 degrees of internal and external rotation was noted. *Id.* at 12. Some tenderness was noted over the biceps tendon and rotator cuff, and some pain with resisted external rotation. *Id.* Dr. Hammer's impression included the following:

> [Ms. Kohl] has persistent loss of motion...some of her discomfort is from chronic rotator cuff tendinopathy related to pronged immobilization from the adhesive capsulitis. She likely has dysfunction of her cuff causing at least some discomfort in addition to the continued loss of range of motion.

*Id.* at 12. A corticosteroid injection and physical therapy was ordered.[26] *Id.*

---

[26] No records related to an injection or physical therapy were not filed.

## IV.   Discussion and Findings of Fact

There is no doubt that petitioner suffered left shoulder injury following receipt of the Tdap vaccine in June of 2013. The issue here is not the existence of an immediate injury but petitioner's claim that the injury continued in excess of six months, a requirement for a claim to be compensable in the Vaccine Program. § 300aa-11.

## A.   The Parties' Arguments

### 1.   Petitioner Submits that the Severity Requirement has been Satisfied

On January 19, 2021, petitioner filed a "Brief in Support of Petitioner's Satisfaction of the Severity Requirement" submitting that petitioner's injury "lasted to at least December 4, 2014.[27]" Petitioner's Brief ("Pet. Br.") at 1. Petitioner argues that the medical records alone provide sufficient evidence:

> In sum, we have a prescription for pain medication to treat Connie's shoulder pain on July 6, 2013. We have a refill of that prescription on April 3, 2014, 9-months later. Then the next medical record we have in this case notes a left shoulder limited range of motion December 3, 2014. Connie has met the severity requirement based on the medical record alone.

*Id.* at 10. Additionally, petitioner argues that the witness statements from petitioner boss, Todd Fischer, are credible and should be credited as affidavits because the witness used the language, "I, Todd Fischer, do swear and affirm the following," though there is no specific perjury language. *Id.* at 12.

### i.   Petitioner Asserts that the Medical Record Alone Satisfies the Severity Requirement

Petitioner argues she began experiencing excruciating pain after her vaccination on June 28, 2013, which forced petitioner to miss work the next day. Pet. Br. at 2. After an emergency room visit on July 6, 2013 and visits to her PCP, she presented to an orthopedist, Dr. Perpich, on August 15, 2013 and received a steroid injection. *Id.* at 4. She did not return to Dr. Perpich because of the out-of-pocket cost, which was well over $300. *Id.* Petitioner concedes that her shoulder was not examined at her March 22, 2014 PCP visit. She however argues she requested a refill for Flexeril on April 3, 2014, 10 months after vaccination highlighting Flexeril as the medication the emergency room physician prescribed for her shoulder pain on July 6, 2013. *Id.* at 4-5. Petitioner argues further that a record on December 3, 2014 evidences continued shoulder pain:

> The nurse practitioner who examined her noted a left shoulder limited range of motion in the review of petitioner's symptoms. [Pet. Ex. 23-72-73] The record again makes no reference to any physical exam. Id. Connie was diagnosed with shoulder pain and should follow-up with occupational health or Dr. Perpich.

---

[27] Petitioner cites the record from December 3, 2014—"December 4, 2014" is presumably a typo.

*Id.* at 5. Petitioner references the therapy records on April 19, 2016 following a fall and injury to her right shoulder that documented a loss of range of motion in left shoulder along with pain/discomfort during abduction. She was provided with exercises and a recommendation to start physical therapy when financially able. *Id.* Lastly, petitioner submits she was seen by Dr. Hammer for lack of range of motion in her left shoulder on October 28, 2019. *Id.* at 5. Dr. Hammer examined petitioner and assessed petitioner with adhesive capsulitis from a vaccination six years ago. *Id.* at 6.

Petitioner argues the foregoing medical records demonstrate that petitioner's shoulder pain persisted for more than six months. Pet. Br. at 10. Petitioner argues the records are consistent regarding left shoulder pain—"there were no notations that [petitioner] was not feeling pain in her left shoulder ever…there was no discharge from care statement from [petitioner] saying that her left shoulder was feeling fine" *Id.* at 11. Further, none of the medical records or statements contradict any testimony or witness statement between June 28, 2013 to December 3, 2014. *Id.* "In fact, there was never a notation in the record that Ms. Kohl's shoulder ever fully recovered. Current medical records document Connie's ongoing injury." *Id.* at 11 n4.

### ii.     Petitioner Argues that the Witness Statements are Credible

In addition to arguing that the medical records alone satisfy the severity requirement, petitioner argues that the witness statements support the six-months severity requirement. *See* Pet. Br. at 12. Specifically, she argues that the two signed witness statements from Mr. Fischer should be considered and credited as appropriate. Conceding there is no perjury language, petitioner notes that Mr. Fischer wrote "I, Todd Fischer, do swear and affirm the following…" in his statement entitled "Affidavit of Todd Fischer" and filed as Exhibit 16. *Id.*

Petitioner also argues the "Court can rely on unsworn statements as evidence if it so decides. At issue in this case are the unsworn statements of a decedent, Dennis Paulus and an uncooperative employer." Pet. Br. at 8. Petitioner argues that exceptions to the hearsay rule could apply to the unsworn statements and that unsworn statements can be considered evidence, within the discretion of this Court to credit or discredit. *Id.* at 9. Petitioner argues that these additional witness statements are consistent with petitioner's testimony and support petitioner being accommodated and assisted at work. *See id.* at 12-13.

### 2.   Respondent Argues that the Severity Requirement has not been Satisfied

In respondent's Cross-Motion for Findings of Fact filed on January 19, 2021, he argues that petitioner failed to provide sufficient evidence to establish that her alleged injury persisted for at least six months. Resp. Cross-Mot. at 9. Specifically, there is not preponderant corroborating evidence, only "three affidavits…oral testimony…and three unsworn statements from two other witnesses." *Id* at 9-10. Respondent analogized the instant matter to *Kirby v. Sec'y Health & Human Servs.,* in which the Court of Federal Claims overturned the special master's decision finding that Ms. Kirby's injury persisted for at least six months when the underlying records only documented

two months of persisting symptoms. 148 Fed. Cl. 530 (2020).[28] *See id.* at 11. Respondent urges the Court to disregard the unsworn witness statements as they appear to lack foundation and are inconsistent with petitioner's statements. *See id.* at 16-17. Respondent further argues that petitioner's own testimony and recollections are inconsistent with the documented record. *See id.* at 18-19.

> ### i.   Respondent Submits that Petitioner's Testimony is Contradictory and Unreliable

Respondent questions petitioner's credibility as a witness and reliability as a historian. Specifically, respondent details that "[petitioner's] recollection of events, i.e., significantly reduced time at work, working alone at Easter, and increased assistance from Mr. Paulus, are contradicted by objective wage records." Resp. Cross-Mot. at 19.

Respondent highlights petitioner's testimony about working alone on Easter, April 20, 2014, when Mr. Paulus's timesheet proves otherwise. When questioned about this discrepancy, petitioner submitted a supplemental affidavit revising her testimony and stating that she worked alone in the afternoon. *Id.* at 18 n.2. Respondent added that petitioner testified that she could not ride a horse until the of fall of 2014, but Facebook posts show her riding a horse in April of 2014. *Id.* Respondent argues that petitioner contradicted herself testifying she worked fewer hours after her shoulder injury, yet later conceded she did not work fewer hours. *Id.* Respondent also argues that the petitioner's timesheet and the timesheet of her coworker, Mr. Paulus, do not substantiate petitioner's testimony that she worked less and Mr. Paulus worked lengthier shifts, "four to six hours each morning," to assist her.[29] *Id.* at 17-18. Petitioner's narrative that she did not seek additional treatment from Dr. Perpich, her orthopedist, due to financial constraints is also questioned by respondent. *Id.* at 12. Respondent argues that her statements contradict the record showing she returned to Dr. Perpich at least four additional times: October 29, 2015, January 17, 2016, February 3, 2016, and April 13, 2016. *Id.*

Further, respondent argues that petitioner conflated her 2013 and 2016 injuries:[30] *See* Resp. Cross-Mot. at 18-19.

---

[28] As discussed above and noted here, *Kirby* has since been reversed by the Federal Court of Appeals specifically on the issue of the severity requirement and the evidence thereof. *See Kirby v. Sec'y Health & Human Servs.,* 997 F.3d 1378 (Fed. Cir. 2021).

[29] "Dennis Paulus's timesheets reflect that in the four months prior to petitioner's alleged injury, he generally worked an average of 3.7 hours each morning. Ex. 20 at 17-20. Mr. Paulus did work one long shift on July 3, 2013, when he worked 5.2 hours, but he did not work at all from July 4, 2013 through July 15, 2013, so he did not assist petitioner on those dates. *Id.* at 16-17. Petitioner stated that she was only assisted by Mr. Paulus in the mornings, yet petitioner's timesheets show that she continued to work later in the day even though Mr. Paulus was not there. Tr. 13 ("it was just me and Denny after the shot. There was no one else to help"); Ex. 19 at 19. In July 2013, Mr. Paulus worked an average of 3.8 hours a day through the end of the month, which is slightly more than his prior average of 3.7 hours a day. *Id.* However, for the remaining months of 2013, he worked an average of 3.4 hours per day, which is slightly less than he worked before petitioner's vaccination. *Id.* at 11-16."

[30] Respondent's argument that petitioner has conflated the events of 2013 and 2016 will not be discussed below when evaluating the relevant evidence and testimony. Whether petitioner may or may not have conflated her injuries is not to be decided by this Court—it would entail speculation and would be unfair to petitioner for the Court to purport to read her mind. Evaluating the evidence relevant to petitioner's 2013 injury claim is sufficient, though respondent's comparisons are noted.

[P]etitioner stated that as a result of her vaccine injury, she could not lift milk buckets until the next summer. Tr. at 14. However, petitioner's records in 2013 and 2014 reflect no such issues, but petitioner's records in 2016 note those specific limitations. For example, on April 6, 2016 (shortly after Easter, which fell on March 30, 2016), petitioner explained to Dr. Perpich that since falling on the ice, she was struggling to lift heavy milk pails while at work. Ex. 27 a 10. On April 19, 2016, during her PT evaluation, petitioner stated that she was struggling to perform her work tasks, and during her treatment in May 2016, petitioner specifically worked on her ability to lift heavy milk pails overhead. Ex. 23 at 19-20.

Petitioner also made clear that she recalled significantly reducing her work hours following her June 28, 2013 vaccination, but as noted above, her wage records belie that statement. However, during a visit with N.P. MacMillian on April 18, 2016, petitioner stated that her symptoms caused by her fall limited her to working only 16 to 31 hours a week. Ex. 23 at 16. Petitioner's wage records also document a significant decline in wages after her fall. Ex. 19 at 1-5.

*Id.* Thus, respondent urges the special master to find that petitioner's testimony "[falls] short of the 'clear, cogent, and consistent testimony' needed to overcome the presumption of accuracy granted to contemporaneously created medical records." *Id.* at 11.

### ii. Respondent Argues No Weight Should Be Afforded Petitioner's Mentioning of Shoulder Pain in 2014 and 2019

Respondent argues the medical records document two months of sequela, the subsequent records mentioning left shoulder are not contemporaneous medical records and should not be afforded any weight. *See* Resp. Cross-Mot. at 11-13.  Respondent points out that petitioner's report of left shoulder pain on December 3, 2014 was in the context of requesting a letter for her attorney and that petitioner did not seek treatment on that date for her left shoulder. Further, ongoing symptoms were not documented at that visit. *Id.* at 11. Additionally, petitioner's report of left shoulder to Dr. Hammer on October 28, 2019 does not provide evidence that petitioner's shoulder pain persisted since June 28, 2013. *Id.* at 13. Further, Dr. Hammer relied on petitioner's self-reported history of frozen shoulder, which petitioner had not been diagnosed with; thus "Dr. Hammer's opinion is undoubtedly based on incorrect information and unsupported statements from petitioner, so that record cannot be given any weight." *Id.* Furthermore, respondent notes the mention of ongoing left shoulder pain in April of 2016 was likely related to her known cervical condition causing issues in both of petitioner's shoulders. *Id.* at 14.

### iii. Respondent Argues that the Witness Statements Should Not Be Afforded Any Weight

Lastly, respondent argues that the Court should discount the statements submitted by third parties in this matter. *See* Resp. Cross-Mot. at 14. Citing the Vaccine Guidelines, respondent explains that affidavits are required when petitioner provides support by way of testimony of a

third party, and that greater weight should be given to testimony when a witness is available for questioning. *Id.* at 14-15.

Respondent questions the foundation and reliability of Mr. Fischer's statements, submitted as Exhibits 8, 10, and 16. Resp. Cross-Mot. 15. Respondent argues that Mr. Fischer's statements are not sworn under oath or notarized and that he provided vague information as to how long petitioner's symptoms lasted and how petitioner's work duties were modified. *Id.* Though Mr. Fischer submitted a more detailed third statement indicating that petitioner's symptoms persisted until Valentine's Day in 2014 and petitioner being provided accommodations until that time, respondent submits that Mr. Fischer did not detail what he relied on for this information. *Id.* at 15-16. Respondent argues that petitioner mainly communicated with Mr. Fischer by phone, which detracts from the reliability of Mr. Fischer's witness statements. *Id.* at 16. Further, respondent cites to Ms. Fischer's admissions, that Mr. Fischer did not monitor petitioner or any of his employees and that he relied only on his memory in writing his statements, to demonstrate a lack of foundation for Mr. Fischer's statements. *See* Pet. Ex. 18.

### B.    Analysis of the Record

Following review of all the records and the parties' arguments regarding the evidence presented, I find that petitioner has not satisfied the severity requirement. Though not all of respondent's arguments are well taken, the arguments advanced by petitioner fall short and the evidence in the record does not preponderantly demonstrate that petitioner's left shoulder pain related to her June 28, 2013 vaccine persisted for more than six months. For the reasons detailed below, I find that petitioner has failed to satisfy the severity requirement.

### 1.    Petitioner's Medical Records Fail to Establish Six Months Sequelae

Petitioner's medical records could be consistent with a shoulder injury persisting for over six months *if* supported by corroborating evidence; however, petitioner's medical records alone only affirmatively document two months of shoulder pain. The rest of petitioner's medical record does not provide preponderant evidence of six months sequelae.

Both respondent and petitioner agree the medical record documents at least two months of petitioner's shoulder pain. *See* Resp. Cross-Mot. at 11; *see generally,* Pet. Br. I find this fact to be evident in the record. Two months of shoulder pain and/or shoulder limitation is sufficiently documented by petitioner's visit to the Emergency Department on July 6, 2013 complaining of sharp shoulder pain and bruising at her injection site, Pet. Ex. 3 at 1, her visit to her PCP on July 8, 2013 during which petitioner had pain with shoulder movement and was prescribed naproxen, Pet. Ex. 2 at 14-15, and petitioner's visit to Dr. Perpich on August 15, 2013 during which she received a steroid injection in her shoulder. Pet. Ex. 4 at 1-2.

The next mention of shoulder pain to any medical professional is on December 3, 2014. Pet. Ex. 23 at 72-73. On that date, petitioner presented for unrelated reasons. In a review of systems, petitioner reported:

> [L]imited range of motion. States this is from a tetanus shot given 1-2 years ago. Needs a statement for her attorney stating she still has decreased range of motion.

Evaluated by Dr. Perpich initially who recommended PT. Patient reports going through PT, massage and "everything."

*Id.* at 72.

Despite this report, the record contains no musculoskeletal examination of her shoulder or specific physical findings documenting the range of motion of her left shoulder on that date. *See id.* at 72-73. Petitioner admits in her brief that there was no reference to any physical exam. Pet. Br. at 5. Respondent correctly argues that petitioner was not seeking treatment or medication for her left shoulder at this visit and further that petitioner did not follow Dr. Perpich's recommendations for therapy or follow-up. The reporting of her left shoulder limited range of motion was seemingly made only for litigation purposes. *See* Resp. Cross-Mot. 11. Lending persuasiveness to respondent's argument is petitioner's reporting at the visit that she had "[gone] through PT, massage and 'everything'" when no such records were filed of any such treatment. Petitioner's report of left shoulder issues on December 3, 2014 comes nearly eighteen months following petitioner's vaccination, and sixteen months after the last contemporaneous medical record documenting shoulder pain. Reports made much later and for litigation purposes are generally afforded little weight. *See Gerami v. Sec'y of Health & Human Servs.*, No. 12-442V, 2013 WL 5998109, at *4 (Fed. Cl. Spec. Mstr. Oct. 11, 2013), *mot. for rev. denied*, 127 Fed. Cl. 299 (2014); *see also Goodgame v. Sec'y of Health & Human Servs.*, 157 Fed.Cl. 62 (2021) (holding that a special master may be skeptical of a medical record created at the request of any attorney in evaluating reasonable basis). As such, I find that petitioner's December 3, 2014 record offers negligible support in establishing the severity requirement.

Petitioner's next saw her PCP for an illness on December 29, 2014. Pet. Ex. 23 at 70. Though arm and shoulder pain were listed under "Current Problems" so were issues from years prior, such as a staphylococcal infection, screening for hyperlipidemia, and skin tag all that had resolved. *Id.* at 70. It appears that the "Current Problems" list carried over items discussed and resolved at prior appointments. More importantly, nothing in the record for the visit on December 29, 2014 indicates that petitioner reported shoulder pain or limited range of motion, mentioned her vaccination, or was otherwise concerned with her left upper extremity. *See id.* Therefore, this record is given little weight.

The next mention of left shoulder pain is almost three years after vaccination, sixteen months after her December 3, 2014 medical visit, and after a significant fall. Pet. Ex. 5 at 67. On April 19, 2016, petitioner presented for physical therapy and a functional assessment of her neck. *Id.* In the self-reported medical history section, petitioner wrote she was presenting for physical therapy for her neck. She circled the back of her neck and the center of her upper back as the location of her symptoms. Pet. Ex. 23 at 15-16. She reported to the physical therapist that she was having significant difficulty working, participating in recreational activities, driving, lifting objects and abduction. Pet. Ex. 5 at 67. Since her fall in February of 2016 that resulted in whiplash and broken ribs, her pain continued to worsen and hindered her performance at work; she had to work with a neck brace. *Id*. X-rays showed significant cervical degeneration. *Id.* She had headaches three to four times a week which chiropractic care helped. *Id.* Her medical history included "left wrist surgery, right thumb surgery, torn left meniscus, osteoarthritis in the knees, and left frozen shoulder." Both of petitioner's shoulders were tested at that time with about a 20 degree of

limitation in left shoulder abduction documented along with the notation "however, this is her norm on both sides." *Id.* at 68. Petitioner's manual muscle test showed some discomfort and pain during left shoulder abduction and "fuzziness" in the fingers and hands when raising her upper extremities past 90 degrees. *Id.* Petitioner was deemed an excellent candidate for therapy and myofascial release; however, her financial situation was a hinderance to attending therapy regularly. *Id.* at 68. Petitioner was advised to attend as much therapy as she could afford and instructed on home exercises to be done daily. *Id.* at 69.

The April 19, 2016 medical record three years after vaccination and in the context of an intervening fall, other injuries and medical issues involving her cervical spine raise doubt as to weight to be afforded in providing preponderant evidence for the severity requirement. That visit noted a 20-degree limitation in motion of the left shoulder but was found that to the normal limitation for both shoulders. Pet. Ex. 5 at 68. Though some pain was noted in petitioner's left shoulder during a manual muscle test with "fuzziness" in the fingers and hands when petitioner raised her arms, these findings were not complaints previously associated with petitioner's shoulder injury following her vaccine. Additionally, following petitioner's fall on ice from which she suffered a broken rib, right shoulder injury and cervical issues requiring her to wear a neck brace, cervical x-rays revealed cervical degeneration. *Id.* at 67. Further, Dr. Perpich, who had seen petitioner for her left shoulder pain following the Tdap vaccine, also saw petitioner on April 6, 2016, did not mention her left shoulder, and attributed her right shoulder pain to her neck, —" I do not think there is a whole lot of shoulder contribution here. I think this is related to cervical degenerative disk disease and an irritation of that from her accident." Pet. Ex. 27 at 11. The medical records reflect no left shoulder pain reported since August of 2013, not even at her December 3, 2014 when petitioner reported limited range of motion for litigation purposes. *See* Pet. Ex. 23 at 72-73. Petitioner also did not report shoulder problems on her intake form or mention the vaccination at her April 19, 2016 visit. *See* Pet. Ex. 5 at 68. The April 19, 2016 records, created nearly three years after vaccination with multiple intervening medical issues and injuries, carries little weight in establishing petitioner's severity requirement.

Six years after vaccination, at an October 2019 appointment with Dr. Hammer, petitioner mentions left shoulder pain. Pet. Br. at 5, Pet. Ex. 24 at 10-12. She reported receipt of a vaccine six years prior resulting in six months of adhesive capsulitis/frozen shoulder and continued loss of range of motion. *Id.* at 11. Examination noted range of motion to be "quite good," with about 60 degrees on internal and external rotation. *Id.* at 12. Some tenderness was noted over the biceps tendon and rotator cuff, with some pain on resisted external rotation. *Id.* Dr. Hammer's impression following petitioner's history and her examination of the left shoulder included:

> persistent loss of motion…some of her discomfort is from chronic rotator cuff tendinopathy related to pronged immobilization from the adhesive capsulitis. She likely has dysfunction of her cuff causing at least some discomfort in addition to the continued loss of range of motion.

*Id.* at 12. Though Dr. Hammer assessed petitioner with loss of motion, it appears that Dr. Hammer did not examine petitioner's right shoulder for comparison. As noted in the medical record on April 19, 2016, petitioner has similar limitations in both shoulders. *See id.* at 10-12; Pet. Ex. 5 at 68. Furthermore, petitioner was never diagnosed with adhesive capsulitis or frozen shoulder. Thus,

Dr. Hammer's impressions were based on an unsupported history provided by petitioner. *See* Resp. Cross-Mot. at 13; *see* Pet. Ex. 24 at 12. The reliability of this record is questionable. It was created six years after the subject vaccination, approximately eight months after the fact hearing on February 6, 2019, and approximately one month after respondent's Motion for Reconsideration. For all these reasons, petitioner's October 28, 2019 record provides little support in establishing the severity requirement.

Petitioner's medical records after the August 15, 2013 visit provide little support in satisfying the severity requirement. The same is true for her argument that refilling her Flexeril prescription on April 3, 2014, nine months after vaccination, provides persuasive evidence of ongoing left shoulder pain that satisfies the severity requirement. Pet. Br. at 10. Petitioner was prescribed Flexeril at her emergency room visit on July 6, 2013. *See* Pet. Br. at 4-5, 10. However, her medical records show that petitioner was prescribed Flexeril on July 26, 2012, a year prior to her receipt of the subject Tdap vaccine by her PCP for low back pain and spasms and had requested refills on September 12, 2012 and December 11, 2012 for the same. Pet. Ex. 2 at 6; Pet. Ex. 23 at 8; *See* Pet. Br. 4-5. Additionally, petitioner was prescribed Naproxen and Gabapentin for her shoulder pain after her initial Flexeril prescription in the emergency room. Pet. Ex. 2 at 15; Pet. Ex. 23 at 7. She did not request refills of either Naproxen or Gabapentin in the months after August of 2013. However, her April 3, 2014 request for a refill of Flexeril was not documented for left shoulder pain but rather for ongoing muscle spasms despite having been to the chiropractor three times that week for these issues. Pet. Ex. 23 at 6. There was no mention of left shoulder pain. *See id.* Both petitioner and Dr. Jones confirmed that her chiropractic treatment only involved back and spinal issues. Pet. Ex. 21 (Dr. Jones's letter advising that he treated petitioner for several years of recurring back pain and only dealt with spinal related issues); Tr. 16 (petitioner testifying that she had regular appointments with Dr. Jones for her back but not for her shoulder). Therefore, petitioner's request to refill the Flexeril prescription on April 3, 2014 was not as she argues for shoulder pain but was for muscle spasms for which she had refilled that prescription several times prior to her vaccination. Her refilling the Flexeril prescription does not satisfy the severity requirement.

Petitioner's medical records fail to provide preponderant evidence that petitioner's left shoulder pain persisted for more than six months. However, the record does not affirmatively establish that petitioner's shoulder injury or pain resolved either. Contrary to respondent's reliance on *Kirby*, the Circuit has instructed that the presumption that medical records are accurate and complete is a faulty one. *Kirby*, 997 F.3d 1378, 1383. Silence in a medical record does not establish nonexistence of a problem. *See id.* Therefore, petitioner's testimony of continued pain is not automatically inconsistent or in contradiction with records that are silent about the nonexistence of such symptoms—her medical records may still be consistent to satisfy the severity requirement. Thus, the additional evidence provided in this matter, such as testimony, timesheets, third-party statements, and social media records must be considered thoroughly and given their proper weight. Special masters may also consider other types of evidence, such as unsworn statements, on the grounds that the Vaccine Program was designed to have "flexible and informal standards of admissibility of evidence." 42 U.S.C. § 300aa-12(d)(2)(B); *see also Munn v. Sec'y of Health & Human Servs.*, 970 F.2d 863, 873 (Fed. Cir. 1992).

## 2.   Petitioner's Testimony Regarding the Duration of Her Injury is Unpersuasive[31]

Petitioner's testimony regarding the onset of her left arm pain following receipt of the Tdap vaccination on June 29, 2013 and the events that followed into August of 2013 are consistent. Pet. Ex. 11 at 2; Pet. Ex. 19 at 20 Tr. 15, 54 (left shoulder pain beginning after midnight following her vaccination, inability to work next day, and difficulties completing her usual tasks at work corroborated by timesheets) Though the weight of Mr. Paulus's statement is limited, it does corroborate petitioner's need for assistance at work in the immediate days following her vaccination. Pet. Ex. 9.

However, the record is unclear on how long petitioner was not able to attend to her usual activities due to left shoulder pain, in both her work and her recreational life. Following an evaluation of the entire record, I find petitioner's testimony unpersuasive and unsupportive of the severity requirements. Though petitioner's testimony of her continued left shoulder pain and disability for more than six months after her vaccination was candid and facially supportive, other evidentiary evidence contradicts and discredits petitioner's statements.

### i.   Petitioner's Facebook Posts Contradict Her Testimony About Horseback Riding

Petitioner testified that one of the benefits of working on a farm is the ability to ride horses. Pet. Ex. 11 at 3. She stated her left shoulder injury rendered her unable to ride for "…probably over a year" because she could not lift the saddle up with one arm and needed two hands to use the reins. Tr. 40. She stated it was not until the fall of 2014 that she took her first ride. *Id.* When it was pointed out during the hearing that petitioner rode in April of 2014, she stated, "I thought it was October, and maybe it was April. *But I know it wasn't right—I didn't ride anything after I was injured.*" Tr. 62 (emphasis added).

Petitioner's Facebook posts prove her testimony to be inaccurate. *See*, Pet. Ex. 17.  A Facebook post on July 31, 2013 at 10:34pm shows, "Carson on our ride tonight," confirming that petitioner rode her horse, Carson, one month after her vaccine injury. *Id.* at 202. While there could be many explanations for how petitioner rode Carson on that date– someone else placed the saddle for her or she held the reigns in one rather than two hands—petitioner specifically testified that she could not ride with one hand. Riding at all contradicts her testimony that she did not ride for some time after her vaccine related injury. *See* Tr. 62.

Another Facebook post showed petitioner sitting on what she described as an "unbroken" horse, Butterscotch, on September 2, 2013. Pet. Ex. 17 at 201. Even if petitioner did not saddle

---

[31] I accept petitioner's explanation that she may not have returned to Dr. Perpich after August 2013 for financial reasons. Tr. 67, 79-80. Her visit with Dr. Perpich and receipt of the steroid injection resulted in a bill for $416.48, which went to collection. Pet. Ex. 26 at 1. Though petitioner did return to Dr. Perpich in 2015 and 2016, her visits were preceded by significant injuries and/or emergency room visits—knee pain from a torn meniscus and neck problems from a fall that resulted in broken ribs and whiplash. *See* Pet. Ex. 27. However, my acceptance of the explanation that petitioner may have had continued pain she did not seek expensive medical care for is inconsequential. The medical records do not indicate that petitioner sought any type of care for her left shoulder after August 2013 until several years later.

Butterscotch, hold both reins or ride Butterscotch, she still managed to mount an unbroken horse which seems unlikely with the inability to use her left arm as she claimed.

Another Facebook post shows, "awesome ride" on April 26, 2014 with someone at the farm named Bill:

> Saturday, April 26, 2014 at 7:21 EDT. Connie Kohl added 2 new photos. Butterscotch and Carson!
> Saturday, April 26, 2014 at 7:24 EDT. Connie Kohl is feeling proud. Had an awesome ride, even ride there (sic) the freestall (sic) barn by the cows! Then played a little!
> Saturday, April 26, 2014 at 7:30pm EDT. Bill did too!

*Id.* at 174.

When questioned about the April 2014 Facebook post after testifying that she could not ride until October of 2014, she stated, "I thought it was October and maybe it was April. *But I know it wasn't right—I didn't ride anything after I was injured.*" Tr. 62 (emphasis added). As mentioned above, this statement is further questionable in light of the Facebook post for her ride on Carson on July 31, 2013, one month after the subject vaccination and injury.

Petitioner's Facebook posts make it difficult to reconcile her testimony about the severity of her injury and her activities. The inconsistency raises questions about the accuracy of her testimony regarding her work limitations as well.

### ii.    Mr. Fischer's Statements Provide Little to Corroborate Petitioner's Testimony

Petitioner testified that her job required her to feed, birth, clean, and otherwise care for calves; she also was tasked to carry and dump five-gallon buckets and lift 50-pound bags of grain. Petitioner was responsible for updating information on the computer system, making ear tags, and monitoring the cows. Tr. 7; Tr. 9; Tr. 59-60, 92-93. Petitioner testified that Mr. Paulus, her coworker, had to perform the heavy lifting and dumping for her after her vaccination. Tr. 12, 36, 56-57. She claimed this continued at least through February 2014, the six-month mark. She recounted in detail her difficulties on Easter, April 20, 2014, when she had to work alone because everyone was off for the holiday; she testified that she struggled in doing all the chores by herself. Tr. 13-14. After hearing, petitioner affirmed she meant to say she worked alone in the afternoon on Easter.  Tr. 14; Pet. Ex. 26 at 2.

In support of her claim that she was unable to attend to her daily work duties for over six months, petitioner provided three statements (two from late 2016 and one from late 2017) from her boss, Mr. Fischer, one statement from her coworker, Mr. Paulus, her timesheets, and Mr. Paulus's timesheets. Pet. Ex. 8; Pet. Ex. 9;  Pet. Ex. 10; Pet. Ex. 16; Pet. Ex. 19; Pet. Ex. 20.

Mr. Fischer's December 16, 2016 letter states:

> In June 2013 my employee Connie Kohl had received a tetanus shot for something
> that was not work related. It affected her left arm making it difficult to use. I was
> able to adjust her duties by having others do what she wasn't able to do. She missed
> some work days, and then worked as much as she could with the help of the other
> employees.

Pet. Ex. 8 at 1. Mr. Fischer's second letter from December 23, 2016 states:

> In June 2013, my employee Constance Kohl had received a tetanus shot for
> something not work related. Following her vaccination, she complained of injury
> of her left arm. She experienced difficulties performing work duties that involved
> use of her left arm, which I adjusted by having others do what she could not. As a
> result of her left arm injury, many of Ms. Kohl's work duties had to be adjusted
> past January 1, 2014.

Pet. Ex. 10 at 1. Mr. Fischer signed this statement and a third party, Ivan Rodriguez, signed the
statement as a witness. *Id.*

On October 31, 2017, petitioner filed a third statement from Todd Fischer entitled
"Affidavit of Todd Fischer." Pet. Ex. 16. It began with the statement, "I, Todd Fischer, do swear
and affirm the following…" *Id.* Mr. Fischer affirmed that he owned Fischer Dairy Farms, which
had multiple dairy farms in the state of Wisconsin. *Id.* at 1. Mr. Fisher affirmed that he employed
petitioner and had employed her since 2012. *Id.* According to Mr. Fischer, petitioner received a
"DTaP" vaccine in her left arm on June 28, 2013. Pet. Ex. 16. She called into the office on June
29, 2013 to report that she could not come to work due to pain in her arm and inability to dress
herself. *Id.* She reported to work on June 30, 2013 for part of the day to check on the baby calves.
*Id.* She returned to work full time on July 1, 2013 but was only able to complete limited tasks. *Id.*
Petitioner was responsible for birthing, feeding, administering shots to, and tagging calves. She
also had to carry, scoop, and dump grain buckets, carry milk pails two at a time, and log reports
into the computer. *Id.* After her vaccine, petitioner received help from her coworker, Dennis
Paulus, for all tasks that required heavy lifting or use of her left hand. *Id.* at 2. She was unable to
carry grain buckets or birth calves and needed assistance administering shots to larger calves. *Id.*
However, because petitioner worked with infant calves from nursing to weaning, she could still
perform many of her work duties. *Id.* She could still scoop the grain, although coworkers had to
help carry the buckets, carry milk pails in her right hand, feed calves with one hand, and log reports
into the computer. *Id.* According to Mr. Fischer, petitioner required help with her duties "until well
after January 1, 2014." Pet. Ex. 16 at 2. Mr. Fischer added that it was not until after Valentine's
Day, February 14, 2014, that petitioner could carry milk pails with both arms to the pasteurizer
and help with birthing the calves. *Id.* Mr. Fischer submitted that petitioner was a valued employee
and he accommodated her as needed until late winter 2014. *Id.* According to Mr. Fischer, following
February 14, 2014, petitioner was able to resume most of her normal duties using her left arm. *Id.*
Mr. Fischer signed the statement and a third party, Anna Isabel Bautista, signed the statement as a
witness. *Id.*

Respondent argues that Mr. Fischer's statements should be disregarded because they are
not affidavits sworn under oath. *See* Resp. Cross-Mot. 15. Respondent further argues that Mr.

Fischer's statements lack foundation because petitioner testified to mostly communicating with Mr. Fischer via phone so he did not observe her and because Mr. Fischer's wife wrote that Mr. Fischer did not monitor his employees. *See id.* at 16. Respondent added that Mr. Fischer's last statement with additional details did not provide how he remembered the information or what he relied on for the detailed information. *See id.* at 15-16. In fact, Mr. Fischer's wife submitted a statement indicating that Mr. Fischer only relied on his memory in writing his statements. Pet. Ex. 18. Respondent further cites the inconsistency between Mr. Fischer's statements regarding accommodations made for petitioner until late winter 2014 and petitioner's testimony that no accommodations were made to demonstrate the unreliability of the statements. *See id.* at 16.

For the following reasons, Mr. Fischer's first two statements are broadly considered as potential corroborating evidence that petitioner required some form of work assistance. First, while Mr. Fischer's statements are not affidavits, Mr. Fischer's statements bore his signature. Respondent is correct that Mr. Fisher's statements are not sworn under oath or the penalty of perjury, but the Vaccine Program was designed to have "flexible and informal standards of admissibility of evidence." 42 U.S.C. § 300aa-12(d)(2)(B); *see also Munn v. Sec'y of Health & Human Servs.*, 970 F.2d 863, 873 (Fed. Cir. 1992) (finding that the Federal Rules of Evidence are inapplicable in Vaccine Act proceedings). It would be contrary to Congress's intentionally relaxed standards to disregard Mr. Fischer's statements. Certainly, these statements carry less weight than affidavits, but should be given some consideration in evaluating petitioner's testimony. Second, respondent's argument that these statements lack foundation because petitioner and Mr. Fischer largely communicated by telephone and because he did not monitor her work is not entirely persuasive. Even if petitioner communicated with Mr. Fischer largely by telephone and Mr. Fischer did not monitor his employees closely, Mr. Fischer's ability to generally observe petitioner's condition and performance is not entirely negated. Petitioner testified that she usually called Mr. Fischer if she needed to communicate with him but she also testified that she would see Mr. Fischer passing by on a tractor or a mixer. Tr. 35-36. It is reasonable that in a large working farm the telephone would be the easiest means of communication. It is further reasonable that Mr. Fischer would have general knowledge of how an employee was performing overall, even if he did not see them every day.

For these reasons, Mr. Fischer's two statements made in December of 2016 were considered. Though not identical, the second statement was more elaborate than the first, the statements are generally consistent with the evidence in the medical record: petitioner was in pain following her vaccination and could not complete her work duties as usual. However, nothing in the record other than petitioner's testimony, supports Mr. Fischer's statement that petitioner required assistance until after the winter of 2014. Mr. Fischer was not produced for testimony at hearing nor was he deposed. There is no other evidence, besides petitioner's word that corroborates how long petitioner required assistance at work. Certainly, her timesheets do not show a reduction in hours worked or an increase in the work of others that can be considered. The severity requirement cannot be met by unsworn, uncorroborated statements. At most, Mr. Fischer's December 2016 statements support the corroborated assertion that petitioner required assistance at work for some time following her vaccination but fails to corroborate how long that assistance was needed or if the six month severity requirement is satisfied. *See* Pet. Ex. 8; Pet. Ex. 10.

Respondent's skepticism of Mr. Fischer's October 2017 statement is warranted. Respondent correctly points out that Mr. Fischer failed to provide any foundation for his recollections. It is difficult to comprehend how Mr. Fischer would remember specific dates, more than three years after the relevant events, without records, messages, or other documentation. Mr. Fischer's October 2017 letter is significantly longer than his other statements and quite detailed. *See* Resp. Cross-Mot. 16; Pet. Ex. 16. Mr. Fischer detailed petitioner's exact tasks, limitations, and dates by which petitioner was able to carry milk pails with both arms. *See* Pet. Ex. 16 at 1-2. He specifically indicated that it was not until after Valentine's Day, February 14, 2014, that petitioner could carry milk pails with both arms, yet petitioner herself never mentions this date with such specificity. *Id.* at 2. Mr. Fischer provides no reasons as to why he would recall how petitioner was performing on Valentine's Day in 2014. He submits no timesheets or other employment records to corroborate his statement. Furthermore, petitioner testified that as of April 20, 2014, Easter, months after Valentine's Day, she was still unable to use her left arm while dealing with the milk pails (though the accuracy of petitioner's testimony is at issue in light of Mr. Paulus's timesheet for April 20, 2014 and the Facebook post showing petitioner horseback riding). *See* Pet. Ex. 11 at 2; Tr. 14. Either way, petitioner and Mr. Fischer do not present the same narrative and it is unclear how the additional and specific information came to exist, especially if Mr. Fischer only relied on his memory as his wife stated. *See* Pet. Ex. 18. For these reasons, Mr. Fischer's third statement is afforded little weight.

Mr. Fischer's statements support the general assertion that petitioner was unable to perform her tasks to the same extent as she was able to prior to her vaccination for some time following her vaccination. However, petitioner's limitations persisting beyond August of 2013 is uncorroborated by the remaining evidence as further detailed below.

### iii.    Petitioner's Testimony Regarding Her Ability to Work is Inconsistent and Only Minimally Corroborated

Petitioner testified that Mr. Paulus always worked the morning with her, and she had different coworkers in the afternoons. Tr. 11. Mr. Paulus did not work in the afternoon. Tr. 12, 56. Because she had difficulty with heavier tasks, petitioner testified that Mr. Paulus had to stay "somewhat later" in the morning to assist her. Tr. 57. Petitioner testified that Mr. Paulus usually worked from 5am until 10am or 11am, the latest. Tr. 56. To help petitioner after her vaccination, he stayed "four to five or six" hours depending on the work. Tr. 57. She stated she was working three or four hours less a day at first, and she did not work a "full, regular" shift or return to working ten to twelve hours a day until "probably spring of 2014." Tr. 54-55. Petitioner testified that she did not do chores by herself until Easter of 2014, which she remembered because of the holiday all her coworkers had off. Pet. Ex. 11 at 2; Tr. 13-14.

After the fact hearing, petitioner submitted a supplemental affidavit revising her testimony. Petitioner affirmed that what she meant to say was nobody worked with her the afternoon of Easter but Mr. Paulus worked with her Easter morning. Pet. Ex. 26 at 2. Petitioner further affirmed she still worked ten to twelve hours days as needed, but she could not accomplish all her usual tasks. *Id.* at 3.

Petitioner's testimony at hearing and the record evidence from her employment is not consistent. Petitioner stated she worked three or four hours less a day after her shoulder injury. Petitioner's work records show that she did not miss any significant periods of time from work or lose pay following her June 28, 2013 vaccination. Pet. Ex. 14 at 1-3. Petitioner's timesheets show regular fluctuations of weekly hours throughout the years, with her overall hours not reduced following her vaccine except immediately after her Tdap vaccination when she called out of work on June 29, 2013 and worked only a few hours on June 30, 2013. Pet. Ex. 19 at 20. A review of the timesheets show petitioner worked just over forty-seven hours the week prior to the subject vaccination. Pet. Ex. 19 at 20.  She worked nearly forty-seven hours the week after her vaccination, July 7, 2013 – July 13, 2013. *Id.* at 19. The next week, July 14, 2014 – July 20, 2013, she worked almost fifty hours. *Id.* at 18-19. Petitioner allegedly regained her ability to accomplish all her tasks and work full hours in the summer of 2014, *see* Tr. 14, but petitioner's timesheet before and after the summer of 2014 do not reflect any significant change. The records show, for example, petitioner worked 118 hours for the pay period of August 1, 2013 through August 19, 2013. *Id.* at 17. For the pay period of December 29, 2013 through January 13, 2014, petitioner worked 113 hours. *Id.* at 7. Corresponding time sheets two years later show that petitioner worked 114 hours for the pay period of December 29, 2015 through January 14, 2016. *Id.* at 5. Overall, petitioner's work records did not corroborate her testimony that she worked reduced hours for any significant period of time. Even though petitioner attempted to clarify or revise her testimony in her supplemental affidavit, affirming that she would still work ten-to-twelve-hour days as needed, petitioner's timesheets suggest that she was consistently working the same or similar hours in 2013, 2014 and 2015. Petitioner was given ample opportunity to provide additional evidence or records in support of the hours worked but provided none.

Petitioner's credibility was tested after she recounted in detail working alone on Easter, April 20, 2014. "[n]obody helped that day"—"nobody else was available to work" so she did the chores herself. Tr. 13-14. She detailed that holiday, 10 months after vaccination as the first time she had to work alone, and how difficult it was while still having trouble with her shoulder. Pet. Ex. 11 at 2; Tr. 14. But the timesheets for that day show that Mr. Paulus worked the morning of April 20, 2014. Pet. Ex. 20 at 7. In response to the discrepancy, petitioner's supplemental affidavit submitted after the hearing affirmed that she did not mean to say she worked alone the entire day. She meant to say nobody worked with her that afternoon, but Mr. Paulus worked with her in the morning. Pet. Ex. 26 at 2. "As I testified, Dennis would work with me in the mornings and some afternoons. On the day in question, Dennis did work with me in the morning, but because it was Easter there was nobody working with me that afternoon." Pet. Ex. 26 at 2. However, prior to her supplemental affidavit, petitioner had never mentioned that Mr. Paulus worked with her some afternoons—in fact, she had testified that Mr. Paulus did not work in the afternoons. Tr. 12, 56. It is difficult to reconcile the detail with which petitioner testified about the efforts and accommodations she had to make in order to work alone that Easter Sunday, only to have the testimony recanted after the hearing in a supplemental affidavit once confronted with timesheets showing the testimony as inaccurate. Giving her some leeway that she may have worked alone the afternoon of Easter Sunday, there are still no records or statements from other workers to confirm this fact. Petitioner's revisions after the hearing and upon being confronted with contradicting documentation detracts from her credibility and provides little evidence in support of the severity requirement.

Lastly, petitioner's statement that Mr. Paulus worked longer hours to help her was not necessarily corroborated by Mr. Paulus's timesheets. Prior to petitioner's vaccine injury, Mr. Paulus worked from 5am until 10am or 11am the latest. Tr. 56. Petitioner testified that Mr. Paulus stayed "somewhat later" to assist her, though just in the mornings. Tr. 57. He helped from "four to five or six" hours depending on the work though he never stayed after noon to assist. Tr. 57. However, petitioner did not specify how often or for how long Mr. Paulus had to assist her in completing tasks. Respondent submits Mr. Paulus's timesheets do not substantiate petitioner's testimony or that he worked more hours to assist her. Respondent states:

> Mr. Paulus did work one long shift on July 3, 2013, when he worked 5.2 hours, but he did not work at all from July 4, 2013 through July 15, 2013…In July 2013, he worked an average of 3.8 hours a day through the end of that month, which is slightly more than his prior average of 3.7 hours a day…for the remaining months of 2013, he worked an average of 3.4 hours per day, which is slightly less than he worked before petitioner's vaccination.

Resp. Cross-Mot. 17-18. My review of Mr. Paulus's time sheets shows he worked both mornings and afternoons—around three-to-four hours in the morning and three-to-four hours in the afternoon. *See generally* Pet. Ex. 20. In the six months prior to June 28, 2013, Mr. Paulus worked fairly consistently in the morning from around 5am for between three-to-four hours and clocked-out mid-morning. He then clocked-in for the afternoon around 1pm, worked between two-to-four hours, and then clocked out. *See id.* at 20-22. During the six months prior to June 28, 2013, Mr. Paulus generally worked between six to eight hours a day, deviated from that schedule six times, and worked more than nine hours a day on six occasions. *Id.* at 17-20. However, on June 29, 2013, Mr. Paulus worked for over seven hours in the morning and on June 30, 2013, he worked over six hours in the morning. *Id.* at 17. In the six months following June 28, 2013, Mr. Paulus deviated from his usual morning schedule over twenty times—clocking-in around 5am, working for three-to-four hours, clocking-out mid-morning, then shortly thereafter clocking-back in for one-to-two hours before clocking-in out for lunch. He continued to clock-in for the afternoon around 1pm. When Mr. Paulus clocked-in twice in the morning, he worked four-to-six hours in the morning. *See id.* at 10-17. Mr. Paulus worked more than nine hours a day twelve times in the six months following petitioner's vaccination. It also appears that Mr. Paulus's schedule deviated with longer mornings on days petitioner did not work, though not exclusively.[32] *See* Pet. Ex. 19; *see* Pet. Ex. 20.

Even with these differences in Mr. Paulus's timesheets, Mr. Paulus's longer mornings were not consistent or with any particular pattern (either increasing or decreasing) and provide little evidence to support petitioner satisfying the six months severity requirement. Though the timesheets provide that Mr. Paulus worked longer mornings on various days, corroborating petitioner's testimony and Mr. Paulus's own statement, it does not provide proof that petitioner needed regular assistance, when petitioner needed assistance, or when petitioner no longer needed assistance. The reasons Mr. Paulus's worked longer hours at time before and after petitioner's vaccine injury cannot be assumed since Mr. Paulus did not testify in this matter and has

---

[32] Comparison between petitioner's timesheet and Mr. Paulus's timesheet, demonstrate that Mr. Paulus's schedule deviated on days petitioner was not present for work. For example, see Pet. Ex. 19 at 16 and Pet. Ex. 20 at 15 (August 24, 2013), as well as Pet. Ex. 19 at 10 and Pet. Ex. 20 at 12 (November 17, 2013).

unfortunately passed away. Therefore, Mr. Paulus's timesheets do not provide preponderant evidence to satisfy the severity requirement though they potentially provide some corroboration for petitioner's testimony. Petitioner did not submit any statements or affidavits from other co-workers who worked the afternoons with petitioner following her vaccine injury to lend any support for accommodations that had to be made to assist her in performing her job or in support that she needed any assistance.

### 3. The Record as a Whole Does Not Contain Preponderant Evidence to Satisfy the Severity Requirement

The record as a whole: the medical records, petitioner's testimony, third-party statements, employment records and Facebook posts, do not establish that petitioner more likely than not suffered from her left shoulder injury for over six months. The medical records affirmatively establish that petitioner experienced two months of sequela. All other medical records mentioning petitioner's left shoulder are assigned little weight due to litigative purpose, time-lapse, and intervening events.

Even though the evidence in this matter may resemble the evidence in *Kirby v. Sec'y Health & Human Servs.*, at first blush, the two months of medical records and a near two-year gap in reporting and treatment, the petitioner in *Kirby* produced home-exercise worksheets that corroborated her testimony that she continued with home-exercises following her last medical appointment for her shoulder. 997 F.3d 1378 (Fed. Cir. 2021) (*reversing Kirby v. Sec'y Health & Human Servs.*, 148 Fed. Cl. 530 (2020). Ms. Kirby suffered a different injury than petitioner in this instance and filed an expert report that corroborated her testimony regarding the course of her shoulder injury. Most importantly, the petitioner's testimony in *Kirby* was consistent with the records submitted and she did not contradict herself. *See id.*

Here, petitioner's testimony and other statements were inconsistent, contradicted themselves and were only minimally corroborated by other evidence filed in this case. Petitioner's Facebook posts show her horseback riding one month, three months and ten months after her vaccine related injury contrary to her testimony that she was unable to ride for over a year, raising questions as to what other activities she claimed she was unable to do but may have been performing during that timeframe. The third-party statements provide some amount of support for petitioner's claim that she required help at work for some period of time but the statements do not provide any support for how long petitioner required assistance due to her left shoulder injury. The severity requirement cannot be found solely on the word of petitioner or on the word of third-parties on the behalf of petitioner; the severity requirement must be established by a preponderance of the evidence. 42 U.S.C. § 300aa-11(c)(1)(D)(i); *see Song v. Sec'y of Dep't of Health & Human Servs.,* 31 Fed. Cl. 61, 65-66 (1994), aff'd, 41 F.3d 1520 (Fed. Cir. 2014) (noting that a petitioner must demonstrate the six-month severity requirement by a preponderance of the evidence); *see Colon, Sec'y of Health & Human Servs.*, 156 Fed. Cl. 534, 541 (2021). Here, petitioner falls short of providing such evidence.

To be clear, petitioner's character is not being questioned. Petitioner is undoubtedly a hard worker, a valued employee, and a caring individual.  Unfortunately, there is insufficient evidence to find the severity requirement has been established by a preponderance of evidence.

## V.      Conclusion

Upon careful review of the record and assigning all evidence their appropriate weight, petitioner has failed to satisfy the severity requirement. Therefore, petitioner's petition is DISMISSED as she has failed to satisfy a requirement of the Vaccine Program. Respondent's Motion to Dismiss is MOOT.

**The Clerk of Court shall enter judgment accordingly.**

**IT IS SO ORDERED.**

<u>**s/Mindy Michaels Roth**</u>
Mindy Michaels Roth
Special Master